******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TOMAS MOREL
(AC 38326)

Keller, Mullins and Harper, Js.

*Submitted on briefs January 11—officially released April 11, 2017*

(Appeal from Superior Court, judicial district of Stamford-Norwalk, geographical area number twenty, Holden, J.)

*Cameron R. Dorman*, assigned counsel, filed a brief for the appellant (defendant).

*Richard J. Colangelo, Jr.*, state's attorney, *Lisa A. Riggione*, senior assistant state's attorney, and *Katherine E. Donoghue* and *Nadia C. Prinz*, deputy assistant state's attorneys, filed a brief for the appellee (state).

*Opinion*

KELLER, J. The defendant, Tomas Morel, appeals from the judgment of conviction rendered by the trial court, following a jury trial, of two counts of larceny in the first degree in violation of General Statutes § 53a-122, and one count of conspiracy to commit larceny in the first degree in violation of General Statutes §§ 53a-48 and 53a-122.[1] The defendant claims that (1) the evidence did not support the jury's finding with respect to two of the three crimes of which he was convicted and (2) the court improperly permitted the state to present uncharged misconduct evidence. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. During the events underlying this appeal, the defendant was a longtime employee of Dooney and Bourke, a company that designs and manufactures handbags and small leather goods, including wallets. Although the company did not provide its employees with written policies and procedures, policies and procedures that governed employee activities were otherwise communicated to employees and, thus, became common knowledge. The defendant was employed as a driver. His duties customarily entailed the transportation of products from the company's manufacturing facility in Norwalk to its distribution center in Orange. At its manufacturing facility, the company manufactured new and sample products, repaired products, and processed products that had been returned by customers.

New products, which left the manufacturing facility daily, were tagged with unique serial numbers. After these products were scanned, they were sealed in boxes containing other new products. A contents label that identified the products in each box was affixed to the outside of each box. Later, skids holding multiple boxes of new products were shrink-wrapped together and, with the use of a forklift, moved into the company truck for transport to the distribution center. Upon arrival at the distribution center, new products were inventoried by the use of scanning equipment and then stored. Thus, the company utilized a procedure that enabled personnel at the manufacturing facility to know exactly what new product was leaving the facility, and personnel at the distribution center to know exactly what new product was arriving at the center.

Skids holding boxes that contained returned and repaired products left the manufacturing facility for delivery to the distribution center along with skids holding boxes that contained new products, but this occurred at irregular intervals, usually two or three times per month. At the manufacturing facility, returned and repaired handbags were placed in boxes along with similar products for shipment to the distribution facil-

ity. However, unlike the situation with new products, there was no procedure in place by which to inventory each returned and repaired handbag at either the manufacturing facility or the distribution center. Instead, boxes containing these handbags were sealed when full, and the number of handbags in each box was inscribed in marker on the outside of the box. Affixed to each box was a document that included the date, number of products in each box, and the destination for each box. Smaller-sized returned and repaired products were packaged and shipped in a similar manner. Prior to their transport and delivery to the distribution center, boxes containing returned and repaired products were stacked on skids with other boxes containing returned and repaired products. Personnel at the manufacturing facility typically did not notify the distribution center to alert it to incoming skids of returned and repaired products. Basic company policy required that, once loaded on the truck for shipment, boxes were not to be opened during transit.

The company manufactured many sample products that were used during "market week" events in New York City four times each year. These products, displayed for store buyers, were transported to New York in what company employees referred to as "coffin boxes" and, later, returned to the manufacturing facility for display. These boxes were smaller than the boxes that were used for new products and those used for returned and repaired products.

The defendant's charges arose from two separate incidents, one that occurred on December 8, 2011, and the other that occurred on October 12, 2012. The December 8, 2011 incident occurred during the company's annual "tent sale," a several-day event that took place in the parking lot of the manufacturing facility beginning on December 7, 2011. During the tent sale, the company sold new products, which were delivered to the manufacturing facility from the distribution center, as well as sample products that were selected for sale from products stored at the manufacturing facility. It was well established company policy that sample products, which were priced for sale by store managers who were brought in to work at the manufacturing facility to assist in the tent sale, were always stored in coffin boxes, not the types of boxes used to store new products. Moreover, it was company policy that sample products be transported around the manufacturing facility in coffin boxes so that supervisors could observe the movement of such products and, if necessary, inquire as to why such products were being transported around the facility. A large amount of new products and sample products were stored in the manufacturing facility until such time as they were brought out to the nearby tent for sale to customers.

In the afternoon of December 7, 2011, Arle Cruz, an

employee working in the packaging area of the manufacturing facility, observed the defendant and two other employees employed in the manufacturing facility, Vincente Morel and Carlos Guillen, stuff three garbage bags with sample handbags and wallets intended for the tent sale that they removed from a skid holding twenty coffin boxes. Each of the garbage bags contained approximately thirty products. The defendant, Morel, and Guillen placed the bags in what company employees referred to as "baby trucker" boxes, a type of box that the company did not utilize to transport sample product, which they transported to Morel's work area, near the loading dock. In an effort to prevent this activity, Cruz positioned the coffin boxes of sample products intended for the tent sale such that they were in view of a company surveillance camera. Morel and Guillen approached Cruz. Morel stated that Cruz was not a supervisor and, while motioning in a threatening manner by moving his hand across his neck, stated that he would cut Cruz' neck. Two hours later, close to 5 p.m., Cruz observed these same baby trucker boxes on the loading dock itself.

The next day, Lourdes C. Lawson, a company employee who worked in the shipping department at the manufacturing facility, observed Morel and Guillen pass by his work station with carts that contained open, untapped, and unlabeled "size 46" boxes of sample handbags. Morel and Guillen were leaving an area in which such handbags were stored and were heading in the direction of the loading dock.

Lawson alerted Anthony Luna, a company employee. Luna's duties included operating the surveillance system in the manufacturing facility. Luna observed the defendant, Morel, and Guillen closing either baby trucker or size 46 boxes in the loading dock area and loading thirteen of these boxes into the company's delivery van. A video recording of these events was captured on company surveillance cameras and introduced in evidence. It was readily apparent to Luna that the boxes contained handbags, and that they had not been properly packed for transport in accordance with company policies (i.e., the boxes did not contain paper and the boxes were not taped closed). Luna inquired where the van was headed, to which the defendant replied, "to New York." The van, driven from the loading dock by Morel and Guillen, was returned to the back of the manufacturing facility within forty-five minutes. This was inconsistent with their having made a round trip to New York City. Additionally, because there was no market week event taking place in New York City, there was no reason for sample product to be transported to New York City on that date.[2]

Several weeks later, the defendant asked Luna if he knew whether the company had installed Global Positioning System (GPS) equipment on the company truck.

Luna replied, "no." The defendant told Luna that he believed that Luna had, in fact, installed the equipment. Then, the defendant stated that "we all have families and I also have a family, and anybody can go crazy." The defendant gestured to Luna by holding his fingers in the shape of a gun, pointing to his head, and stating: "Boom." Also, the defendant told Luna "not to say anything, to shut up." Luna understood this threat to refer to what he might have learned about the defendant's activities by use of the video cameras. Thereafter, Luna and another coworker, Albert Richard, reported the incident to Philip Kinsley, the company's vice president of finance.

The second incident underlying this case occurred on October 12, 2012. By this point in time, Kinsley had become concerned about the theft of products from the manufacturing facility. In June, 2012, Kinsley cautioned the defendant that he would be fired if he was stealing from the company. Although the defendant denied taking part in company theft, Kinsley, having reviewed GPS information from the company truck, observed that the defendant's deliveries from the manufacturing facility to the distribution center were taking longer than they should and that the defendant frequently made stops during these deliveries. Kinsley was notified that a skid holding returned and repaired merchandise was being delivered to the distribution center on October 12, 2012, and he closely monitored the defendant's activities with respect to this shipment. Company surveillance video reflected that the defendant loaded a skid, which held seventeen boxes of returned and repaired products. These consisted of 159 handbags and 104 small leather goods. All together, these products had a total average value of $85,338.[3] The defendant loaded this skid into the company truck on October 12, 2012. The defendant loaded two skids holding new product into the company truck, as well, before departing from the manufacturing facility alone in the truck.

GPS information reflected that the defendant left the manufacturing facility in Norwalk at 8:02 a.m. The defendant did not proceed directly to the distribution center in Orange. Among several stops that the defendant made was one during which he exited Interstate 95 northbound and proceeded along local roads to an underpass under Interstate 95. The truck remained at this location for nineteen minutes, between 9:03 a.m. and 9:22 a.m. When the defendant arrived at the distribution center, the company truck contained the two skids holding new product, but the third skid, holding the returned and repaired products, was not in the truck. After delivering the skids containing new products, the defendant returned to the manufacturing facility at 12:50 p.m.

When the defendant was arrested in this case, he made a threatening statement to one of the arresting

police officers, William Matson. The defendant was under the mistaken belief that Matson's mother was one of his coworkers at the company. He asked Matson if his mother worked at the company. When Matson replied that he did not know what the defendant was talking about, the defendant replied: "[I]t must be the other officer, and you can let her know we'll be seeing her soon." In response to the defendant's threat, Morel and Guillen, who were nearby, began to laugh. The mother of another arresting police officer, Nikolas Kougioumtzidis, worked at the manufacturing facility in November, 2012. Additional facts will be set forth as necessary.

I

First, the defendant claims that the evidence did not support the jury's finding that he was guilty of larceny in the first degree and conspiracy to commit larceny in the first degree as a result of his activities with Morel and Guillen on December 8, 2011, at the time of the tent sale. We disagree.

The defendant's arguments may be summarized as follows. He argues that the state failed to demonstrate that he possessed the requisite intent to commit larceny. He argues that the evidence reasonably demonstrated that he, Morel, and Guillen placed sample products in the company van on December 8, 2011. He argues that although there was evidence that certain of his activities with respect to handling and moving the sample products violated company policy, such breaches of policy did not reasonably support a finding that he intended to deprive the company of the products. Instead, in light of evidence that salespersons who did not customarily work at the manufacturing facility helped to oversee the tent sale and evidence that, in the past, the company van had been used to transport products to the tent sale, he argues that "[i]t is equally likely that the sales staff instructed the defendant, Guillen, and [Morel] to bring the handbags to the tent, and they put the sample product into larger shipping boxes to make it easier for them to bring the sample product to the tent." He argues that the evidence reflects that the men did not conceal their activities and that, to the extent that Morel threatened Cruz, his conduct reasonably could be understood to be an expression of anger directed at Cruz for interfering with his work.

Moreover, the defendant argues that the state failed to demonstrate that a wrongful taking occurred. He argues that "[t]here was no evidence offered to prove that the sample bags were actually missing or even the actual number of sample bags that were missing. No documentation was offered that itemized the sample product that was allegedly stolen. No testimony by the sales force, or any other person that could definitively say or prove that sample bags intended for the tent sale went missing or even how many actually went missing."

Addressing the evidence that the company van appeared to be absent from its customary location in the back of the facility for approximately forty-five minutes, the defendant argues that there was no evidence with respect to the van's whereabouts during this period and that "[n]o one testified that the van went anywhere other than to the tent," which was located in a parking lot on the premises. The defendant argues that because it is speculative to conclude that the van was driven beyond company property, a finding that the defendant deprived the company of ownership of the sample products is unsupported by the evidence. The defendant claims that the evidence did not support a finding that he engaged in a wrongful taking or that he conspired to engage in a wrongful taking.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Millan*, 290 Conn. 816, 825, 966 A.2d 699 (2009).

Section 53a-122 provides in relevant part: "(a) A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds twenty thousand dollars . . . ." General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." "Connecticut courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner. . . . Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective

desire or knowledge that his actions constituted stealing. . . . Larceny involves both taking and retaining. The criminal intent involved in larceny relates to both aspects. The taking must be wrongful, that is, without color of right or excuse for the act . . . and without the knowing consent of the owner. . . . The requisite intent for retention is permanency." (Internal quotation marks omitted.) *State* v. *Flowers*, 161 Conn. App. 747, 752, 129 A.3d 157 (2015), cert. denied, 320 Conn. 917, 131 A.3d 1154 (2016). Section 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

Essentially, the defendant argues that the state failed to prove beyond a reasonable doubt that a wrongful taking occurred because the state was unable to demonstrate precisely what happened to the boxes that were loaded into the company van on December 8, 2011. The defendant's argument fails, however, because in the present case there was ample circumstantial evidence that permitted the jury to infer that the defendant wrongfully took possession of the items, thereby depriving the company of ownership and control of them. The evidence permitted a finding that the defendant was a seasoned employee who knew or should have been aware of company policies governing the handling and transport of products, including the policies governing the sample products stockpiled for sale at the company's annual tent sale.

In violation of those policies, the defendant removed sample bags from coffin boxes. He put them into garbage bags. Later, in contravention of company policies, he put them into baby trucker boxes that were not used for sample handbags. He moved these improperly boxed products, which were intended for sale at the tent sale, into Morel's work area near the loading dock. The next day, again in contravention of company policies, Morel and Cruz moved more improperly boxed sample products to the loading area. At least one coworker viewed this conduct suspiciously in that it appeared that "the guys are grabbing something and the manager is not here." The defendant, Morel, and Cruz were observed moving the boxes into the company van. Later, Morel and Cruz left the loading dock in the van, which was observed forty-five minutes later, parked in the back of the manufacturing facility. At this point in time, the van was empty.

The defendant urges us to conclude that it was irrational for a finder of fact to draw negative inferences from these subordinate facts, to infer that a taking had occurred, or that the defendant conspired with Morel and Guillen to engage in a wrongful taking. The defen-

dant argues that his mere breach of company policies did not foreclose lawful explanations for his conduct. In evaluating the sufficiency of the evidence, however, we do not examine the record to determine whether an innocent view of the evidence may have existed. Instead, we look to the finder of fact's guilty verdict and ask whether there is any rational view of the evidence that supports it. See *State* v. *Millan*, supra, 290 Conn. 825.

Here, the jury reasonably could have found that the sample bags loaded into the van on December 8, 2011, by the defendant and his coconspirators were wrongfully taken from the company and that the defendant and his coconspirators, by their coordinated activities in terms of improperly packaging the products, moving the products to the company van, and attempting to conceal their activities and avoid detection, had conspired to commit larceny. Such an inferential leap was possible in the present case because there was ample circumstantial evidence of wrongdoing surrounding the products loaded into the van. The evidence permitted a finding that the defendant, as a longtime employee, not only knew the company policies that would have precluded him from handling sample products intended for sale at the tent sale in the manner that he did, but that, due to weaknesses in the company's ability to monitor sample products and the increased personnel brought to work at the tent sale, that the tent sale afforded him a favorable opportunity to engage in theft and to avoid detection.

Moreover, there was ample evidence that the defendant and his coconspirators knew that their conduct was wrongful and that they took steps to discourage their coworkers from reporting it. Specifically, we refer to the threatening statements made by Morel to Cruz, as well as the threatening statements made to Luna by the defendant. It was well within the fact-finding province of the jury to interpret these statements as being highly incriminatory, as efforts by the defendant, Morel, and Cruz to silence their coworkers because they knew that they were engaged in wrongdoing and wished to evade detection. It would not have been unreasonable for the jury to have evaluated the evidence in light of these comments, thereby rejecting innocuous explanations of the conduct of the defendant and his coconspirators in favor of a finding of guilt. The defendant's threatening statement to Officer Matson, as well, belied an innocuous view of the defendant, but was consistent with a finding that the defendant was conscious of his guilt and, therefore, wished to avoid arrest.

Additionally, there is the evidence that, when Luna asked the defendant where the company van, in which the products at issue were loaded, was headed, the defendant replied that it was headed to New York City.

There was testimony from Luna that he saw the van again forty-five minutes later. The defendant suggests that it is reasonable to infer that Morel and Guillen delivered the products in the van to the tent sale, returned the van to the back of the facility, and then drove to New York City in their own vehicle. In light of the evidence that the defendant and his coconspirators acted in violation of several company policies while in the act of removing products from the manufacturing facility, and that the defendant and his coconspirators made threatening statements to their coworkers when they suspected that their activities had been observed by them, the jury reasonably could have rejected such a benign explanation in favor of a finding that the defendant's statement was an attempt to conceal the theft of the sample products by making it appear as though the sample products were headed to New York City. Moreover, the defendant's response to Luna wholly belies the explanation, deemed "reasonable and plausible" by him, that the defendant and his coconspirators took the actions that they did simply to move product to the tent sale. The defendant replied that the van was headed to New York City; he did not state that it was headed to the tent sale. Thus, his response to Luna was contrary to the theory of the evidence he urges us to accept. Stated otherwise, the jury reasonably could have concluded that, having been asked by a coworker where the van was headed, the defendant would have simply stated that it was being loaded for a delivery to the tent sale if, in fact, that was the van's destination.

The defendant deems it to be "significant . . . that the men did not attempt to conceal any of their activities." Criminal liability does not require a showing of concealment. To the contrary, this court has observed that, in certain circumstances, a criminal may undertake larcenous activities in plain view because he or she believes that it may assist in avoiding detection or because it is not feasible to conceal such activities. See, e.g., *State* v. *Flowers*, supra, 161 Conn. App. 758. Alternatively, the jury could have viewed the conduct of the defendant and his coconspirators, in placing the products into garbage bags and, later, into boxes that were not used for sample products, as being acts of concealment. The defendant's statement to Luna that the van was headed to New York City also reasonably could have been viewed as an attempt to conceal the true nature of his actions. Certainly, the defendant's attempts to conceal his conduct support an inference that the defendant wrongfully took the property. See, e.g., *State* v. *Saez*, 115 Conn. App. 295, 305, 972 A.2d 277 (defendant's conduct in pushing store merchandise in its original packaging under theft detection device at front door of store and then exiting with it reasonably supported inference that he intended to convert property to his own use without paying for it), cert. denied, 293 Conn. 909, 978 A.2d 1113 (2009).

In light of all of this evidence, it was reasonable for the jury to infer that the sample products that the defendant and his coconspirators removed from the facility and loaded into the company van were not delivered to the tent sale, but that they were removed from company property altogether, thus depriving the company of ownership of them. There was ample testimony concerning the estimated quantity and nature of the products loaded into the van, and it does not relieve the defendant of criminal liability that the state, due to company inventory practices, was unable to present documentation from the company with respect to the specific products at issue.

The defendant argues that there was "[n]o testimony by the sales force, or any other person that could definitively say or prove that sample bags intended for the tent sale went missing or even how many actually went missing." Consistent with the evidence that the defendant and his coconspirators acted in violation of many company policies—many of which were related to safeguarding products in the facility—and that they acted in a manner that suggested that they were aware that they were engaged in wrongdoing, attempted to conceal their activities, and attempted to evade detection by company superiors, the jury reasonably could have inferred that the products loaded into the van were not delivered to the tent sale, but that they were wrongfully taken. Such an inferential leap was supported by the evidence, viewed in its entirety, and it does not relieve the defendant of criminal liability that the state was unable to present more definite evidence with respect to the final destination of the fruits of the defendant's larcenous activity. Cf. *State* v. *Adams*, 164 Conn. App. 25, 37–40, 141 A.3d 875 (2016) (ordinary innocent conduct of defendant and coconspirator did not support inferential leap that they removed inventory from store). The state may present sufficient evidence to sustain a conviction of larceny even in cases in which the items wrongfully taken were never recovered and the only evidence with respect to their value consists of the testimony of the complaining witness. See, e.g., *State* v. *Baker*, 182 Conn. 52, 62–63, 437 A.2d 843 (1980); *State* v. *Browne*, 84 Conn. App. 351, 387, 854 A.2d 13, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004). To be sure, evidence that the defendant and his coconspirators were later found to be in possession of the sample products at issue would have been compelling evidence of the wrongful taking and the criminal intent to conspire to wrongfully take the products. Even absent such evidence, the evidence presented by the state satisfied its burden of proof with respect to proof that a wrongful taking by the defendant had occurred and that the defendant had conspired with Morel and Guillen to wrongfully take the products at issue.

II

Next, in challenging his conviction of larceny in the first degree arising out of his conduct on October 12, 2012, the defendant claims that the court improperly permitted the state to present uncharged misconduct evidence. We disagree.

We already have discussed the facts related to the incident on October 12, 2012, for which the defendant was convicted of larceny in the first degree under count three of the state's information. Prior to trial, the state filed a motion seeking the admission of uncharged misconduct evidence. Relevant to this claim, the state sought to present evidence with respect to the defendant's activities on September 27, 2012, and October 19, 2012, for the purpose of demonstrating that he had a larcenous intent on October 12, 2012. The court held a hearing related to the motion, during which it heard testimony from several witnesses.

Consistent with the testimony it heard at the hearing, the court permitted the state to present evidence at trial that, in August, 2012, Kinsley became suspicious of the length of time it was taking for deliveries to be made and believed that one or more employees were engaging in theft. Kinsley contacted William Ramos, the vice president of loss prevention for the Zellman Group, which provided security services for the company. In September, 2012, Ramos installed GPS devices in the company truck and the company van. Ramos, joined by his associate, Stuart Levine, surveilled the defendant while he was operating the company truck on September 27, 2012, and October 19, 2012.

On September 27, 2012, in violation of company policy, the defendant was observed making multiple stops during his round trip from the manufacturing facility to the distribution center. On this date, however, the defendant was not transporting returned or repaired products.

On October 19, 2012, a day on which the defendant was transporting returned and repaired products from the manufacturing facility to the distribution center in the company truck, Ramos and Levine surveilled the defendant in separate vehicles. On this occasion, the defendant was observed exiting the highway on his way to the distribution center, parking the company truck in between two large trucks at a highway rest area, opening the rear cargo door of the truck, entering the back of the truck, lowering the cargo door so that there was only a small gap between the door and the floor of the truck, and moving boxes in the back of the truck. Thereafter, the defendant parked his truck at a secluded underpass beneath Interstate 95. GPS data introduced into evidence reflected that this was not a random location, but that the defendant stopped at this underpass during his delivery from the manufacturing facility to the distribution center on October 12, 2012, as well. A

pickup truck approached, but the driver of the pickup truck likely observed Ramos and, thus, became aware that he and the defendant were under surveillance. The driver exited his truck, approached the defendant in the company truck, and spoke with the defendant briefly. Soon after this conversation, the defendant left the scene and proceeded to the distribution center.

Scott Gavitt, a company employee, observed the delivery at the distribution center after the defendant unloaded the delivery. It was apparent to Gavitt that, contrary to company policies and his long experience with the company, the skid of returned and repaired products was not shrink-wrapped as it should have been and that two boxes on the skid had been opened. For Gavitt, it was unprecedented that boxes had been opened and that products apparently had been rearranged in transit; one of the boxes on the skid contained two items that were not listed on its packing list and another box on the skid contained two fewer items than were listed on its packing list.

The state also presented evidence that, after October 19, 2012, when the defendant became aware that he was under surveillance, there was a change in his delivery driving habits. Specifically, there was evidence that, after the events of October 19, 2012, the defendant's average driving time for a round trip from the manufacturing facility to the distribution center decreased by roughly 50 percent, unauthorized stops ceased, and he acted like "a model employee."

The defendant objected to this evidence on the ground that the evidence was not relevant to prove his intent on October 12, 2012, and, even if it was relevant, its probative value was outweighed by its likely prejudicial effect upon the jury. The court stated that it had considered the admissibility of the proffered evidence under the appropriate balancing test. The court stated that the evidence was "material and relevant" with respect to the issue of intent. The court went on to state that it had carefully considered whether the evidence, though relevant, should be excluded due to a risk of unfair prejudice, surprise, confusion of the issues, misleading the jury, or undue delay. In particular, the court observed that one of its concerns was that it did not want the evidence to lead to an inference in the minds of the jurors of "once a thief, always a thief." The court admitted the proffered evidence, limited its use to the events of October 12, 2012, and determined that a limiting instruction with respect to the permissible inferences to be drawn from the evidence was appropriate.

After the evidence at issue was presented to the jury, the court delivered the following limiting instruction: "[Y]ou've heard testimony regarding conduct that took place on the 27th of September and October 19.

"That was offered for a limited purpose in this matter.

One element of larceny is the intent. The specific intent to deprive the owner of property on a permanent basis.

"The dates in which the testimony regarding Mr. Levine and Mr. Ramos and others who may testify regarding the surveillance and activities on October 19 and September 27 are offered only, if you so find, on the element of intent, nothing else.

"Whether or not that element of intent can be proven, proof beyond a reasonable doubt, the limited nature of the evidence of the testimony, if you so find the evidence to be that, on September 27 and October 19, only to be used in determining whether the state has satisfied the element of intent, based upon all of the evidence that has been presented. And no other purpose." Consistent with this instruction, the court provided an additional limiting instruction to the jury during its charge, limiting the jury's consideration of the evidence to the larceny charge arising from the defendant's conduct on October 12, 2012. The court stated that the evidence was not admitted to prove the defendant's bad character or his tendency to commit criminal acts. Also, the court stated: "You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity." The court reiterated that if the jury determined that the evidence was not persuasive with respect to the sole issue for which it may be considered, intent, then the jury may not consider it for any other purpose. During closing argument, the prosecutor argued that the evidence of the defendant's activities on September 27, 2012, and October 19, 2012, should be viewed as misconduct evidence that was relevant to an understanding of his larcenous intent on October 12, 2012. The prosecutor argued that, if Ramos had not been observed by the defendant's accomplice on October 19, 2012, "the returned merchandise [on the company truck] would never have made it to the warehouse [that day]."

As he did at trial, the defendant challenges the court's ruling to admit the uncharged misconduct evidence on the grounds that it was not relevant and that, if it was relevant, it was unduly prejudicial. "The standard of review regarding uncharged misconduct evidence is well established. Evidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for example, the evidence is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evi-

dence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . . Since the admission of uncharged misconduct evidence is a decision within the discretion of the trial court, we will draw every reasonable presumption in favor of the trial court's ruling. . . . We will reverse a trial court's decision only when it has abused its discretion or an injustice has occurred." (Internal quotation marks omitted.) *State* v. *Franklin*, 162 Conn. App. 78, 96, 129 A.3d 770 (2015), cert. denied, 321 Conn. 905, 138 A.3d 281 (2016); see also Conn. Code Evid. § 4-5.[4] Our Supreme Court "has previously enumerated situations in which the potential prejudicial effect of relevant evidence would counsel its exclusion. Evidence should be excluded as unduly prejudicial: (1) where it may unnecessarily arouse the jury's emotions, hostility or sympathy; (2) where it may create distracting side issues; (3) where the evidence and counterproof will consume an inordinate amount of time; and (4) where one party is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Rinaldi*, 220 Conn. 345, 356, 599 A.2d 1 (1991).

Here, the court found that the evidence at issue was probative with respect to the defendant's intent on October 12, 2012. One of the essential elements of larceny is "the existence of a felonious intent in the taker to deprive the owner of [the property] permanently . . . ." (Internal quotation marks omitted.) *State* v. *Flowers*, supra, 161 Conn. App. 752. The defendant argues that the relevance of this conduct was insignificant and that it did not shed light on his intent on October 12, 2012. The defendant acknowledges that the evidence supported findings that the defendant violated the company's unwritten policies by (1) making unnecessary stops on both September 27, 2012, and October 19, 2012; (2) entering the back of the truck and opening boxes on October 19, 2012; and (3) meeting and speaking with someone in a pickup truck at the underpass on October 19, 2012. The defendant argues that none of these acts was criminal in nature. The defendant urges us to reject the state's theory that these events should be viewed as a failed attempt to steal company products.

We reject the defendant's arguments because they are the product of his drawing only those inferences that are favorable to him from the uncharged misconduct evidence. The jury reasonably could have inferred from the uncharged misconduct evidence, viewed in the light of other evidence presented at trial, that it demonstrated a failed attempt by the defendant to steal company products on October 19, 2012, an attempt that was thwarted when the defendant became aware that he was under surveillance. Such an inference was made more reasonable by the evidence that, after October 19,

2012, the defendant's habits during deliveries changed such that he became much more efficient in terms of making his deliveries to the distribution center. The conduct of September 27, 2012, in violation of company policy, was relevant to distinguish between the defendant's conduct when he was transporting returned and repaired products, and when he was transporting new product that the company was able to closely monitor. The conduct on September 27, 2012, reflected that, when the defendant was merely transporting new product, he merely made unauthorized stops. In contrast, his conduct on October 19, 2012, reflected that the defendant opened boxes when he was transporting returned and repaired products. It was relevant to demonstrating that the defendant likely behaved in a similar manner when he was transporting returned and repaired products on October 12, 2012.

Moreover, the evidence at issue tended to demonstrate that he had a larcenous intent on October 12, 2012, when he was transporting returned and repaired product. "It is well established that the question of intent is purely a question of fact. Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Internal quotation marks omitted.) *State* v. *Silva*, 285 Conn. 447, 460, 939 A.2d 581 (2008). Not only were the events portrayed in the uncharged misconduct evidence of October 19, 2012, remarkably similar to the evidence of the defendant's conduct on October 12, 2012, but they occurred close in time to the charged misconduct. Stated otherwise, the uncharged misconduct evidence did not relate to bad acts that were unrelated to the charged misconduct, or to general criminal tendencies, but to misconduct that involved the defendant's theft of similar returned and repaired products, from the company, during the course of his delivery work, and at the same underpass. Thus, the evidence did not give rise to an ambiguous inference that the defendant intended to steal, but it was inherently suggestive of his larcenous intent on October 12, 2012.

The defendant proceeds to argue that, if relevant, the evidence nonetheless was unduly prejudicial because it created a complicated and distractive side issue; "[t]he evidence was complex in that there were multiple dates for both the misconduct as well as the crimes charged"; and, given the nature of the evidence, it would have been very difficult for the jury not to engage in the type of "once a thief, always a thief" reasoning that the law forbids.

The law does not furnish an easy to apply formula for determining whether the introduction of uncharged misconduct evidence is complicated or whether it creates a side issue that is likely to distract the jury. Such issues are best entrusted to the sound discretion of the trial court. Here, having carefully reviewed the record, we are not persuaded that the evidence at issue was either so complex as to confuse or distract the jury or that its introduction took up such a significant amount of time that it was likely to confuse or distract the jury. The evidence had significant probative value, and its introduction did not create a side issue, but was relevant to an essential element of a crime, specifically, whether the defendant had a larcenous intent. The evidence, concerning the company's policies, GPS information, testimony from witnesses, including Ramos, Levine, and Gavitt, was not inherently difficult to understand or so foreign to the other evidence presented at trial such that we are persuaded that its introduction would have caused prejudice to the defense.

Finally, to the extent that the defendant urges us to conclude that the introduction of the evidence was unduly prejudicial because the jury would have considered it for an improper purpose, we are mindful that such a danger exits whenever uncharged misconduct is admitted. In light of the high probative value of the evidence, the probative value of the evidence would be outweighed only upon a showing of a high degree of prejudice. See, e.g., *State* v. *Rizzo*, 266 Conn. 171, 290, 833 A.2d 363 (2003) (evidence with "high probative value" improperly excluded by trial court on ground that it was unduly prejudicial); *State* v. *Tocco*, 120 Conn. App. 768, 794, 993 A.2d 989 (trial court properly admitted evidence that had tendency to arouse emotions of jury because evidence had "high probative value"), cert. denied, 297 Conn. 917, 996 A.2d 279 (2010). Such has not been shown in the present case. Here, the court took several steps to decrease the likelihood that the jury would have viewed the evidence as propensity evidence. The court delivered a limiting instruction immediately after the evidence was presented. The court delivered additional, more detailed instructions during its final charge. In addition to constraining the jury to view the evidence for its admitted use, the court limited the jury's consideration of the evidence solely as to the charge of larceny in the first degree that related to the defendant's conduct on October 12, 2012; the court did not permit the jury to consider the evidence in connection with the offenses that arose from the defendant's conduct on December 8, 2011. Nothing in the record suggests that the jury did not follow these instructions. Furthermore, there is no suggestion that the prosecutor, in argument to the jury or otherwise, suggested to the jury that it should consider the evidence for an improper purpose. In light of the foregoing analysis, we conclude that the admission of the evi-

dence did not reflect an abuse of discretion.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] With respect to each of the three offenses of which the defendant was found guilty, the court imposed a sentence of ten years of incarceration, suspended after four years, followed by five years of probation. The sentences were concurrent in nature. Thus, the court imposed a total effective sentence of ten years of incarceration, suspended after four years, followed by five years of probation.

[2] There was evidence that Luna did not immediately report what he had observed because he feared that the coworkers involved would retaliate against him.

[3] There was evidence that, if the stolen products consisted of the company's lowest priced handbags and small leather goods, its value would be $26,977.

[4] Section 4-5 of the Connecticut Code of Evidence, titled "Evidence of Other Crimes, Wrongs or Acts Generally Inadmissible," provides in relevant part: "(a) . . . Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection (b).

"(b) . . . Evidence of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if: (1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the evidence outweighs its prejudicial effect.

"(c) . . . Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(d) . . . In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct."

We note that although § 4-5 was amended, effective January 1, 2012, that amendment is not relevant to this appeal. For convenience, we refer to the current revision of § 4-5.