******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* BRYANT WILSON
## (AC 42914)

Alvord, Moll and Clark, Js.

*Syllabus*

Convicted of the crimes of murder and carrying a pistol without a permit as a result of the shooting death of the victim, the defendant appealed, claiming, inter alia, that he was deprived of his right to present a defense when the trial court improperly instructed the jury about the adequacy of the police investigation. The defendant's theory of defense was that the police conducted an inadequate investigation during which, among other things, they failed to investigate leads, did not attempt to obtain DNA profiles or request DNA testing of certain evidence, and failed to treat four individuals as suspects and take DNA samples from them, even though they were in the vicinity of the shooting at about the time it occurred. The defendant filed a request to charge as to the inadequacy of the police investigation that differed from the model jury instruction on the Judicial Branch website at that time. After conducting a charging conference with counsel, the trial court used the model instruction rather than the defendant's requested charge. The defendant claimed that the court's instructions effectively told the jurors to disregard the adequacy of the police investigation as it related to the strength of the state's case and to disregard his theory of the case. During the pendency of the defendant's appeal, our Supreme Court issued its decision in *State* v. *Gomes* (337 Conn. 826), in which it held that the model jury instruction improperly failed to inform the jury of a defendant's right to present evidence of investigative inadequacy and the jury's right to consider such deficiencies in evaluating whether the state proved its case beyond a reasonable doubt. *Held*:

1. The trial court erred when it instructed the jury regarding the adequacy of the police investigation, as it was reasonably possible that the instructions misled the jury to believe it could not consider the defendant's arguments as to that issue:

a. Contrary to the state's assertion that the defendant's claim was unpreserved because it was substantially different from the claim he raised at trial, his written request to charge sufficiently covered the matter, the defendant requested language that was different from and more comprehensive than that contained in the model jury charge on the Judicial Branch website, and his requested charge omitted language that the court in *Gomes* found presented a significant risk of misleading the jury.

b. The defendant did not waive his preserved claim of instructional error: the defendant did not withdraw his request for a jury instruction on the inadequacy of the police investigation, and nothing in the record of the charging conference demonstrated an intention by the defendant to abandon his request; moreover, a reasonable reading of defense counsel's statement during the charging conference that the court included in its proposed charge two of his instructional requests was that counsel was mistaken as to the content of the court's proposed charge and wrongly believed the court included his proposed investigative inadequacy charge; furthermore, a reasonable reading of the prosecutor's comments during the charging conference was that he did not believe the defendant's request had been effectively withdrawn.

c. The trial court's use of the model jury instruction on investigative inadequacy was harmful, and, thus, the defendant was entitled to a new trial: the state's case was not strong, as its primary evidence was from jailhouse informants who testified in exchange for beneficial treatment in their pending criminal matters, the physical evidence focused on a hat that was found in bushes near the crime scene, which contained the DNA of two other individuals in addition to that of the defendant, there was no evidence outside of the jailhouse informant testimony that the assailant wore a hat, and the gun allegedly used was problematic in that no forensic evidence linked it to the shooting and no casings were found at the scene; moreover, there were no eyewitnesses to the shooting, and

the defendant did not appear on any of the surveillance videos obtained by the police.

2. The trial court did not abuse its discretion by admitting certain uncharged misconduct evidence pertaining to two shootings that occurred subsequent to the victim's death: the probative value of the uncharged misconduct evidence was high, as the subsequent shootings connected the defendant with the gun allegedly used in the homicide of the victim, the defendant's guilty pleas as to the subsequent shootings and a statement he made to the police that he liked to play with guns were probative of his means and opportunity to commit the charged crimes, and a spent shell casing in a handgun the police recovered at the scene of one of the subsequent shootings, and testimony related thereto, were probative as to the lack of shell casings found at the scene of the victim's homicide; moreover, it was unlikely that the facts of the two subsequent shootings, which were significantly less severe than the charged crimes in that there were no injuries, unduly aroused the emotions of the jurors; furthermore, the uncharged misconduct evidence did not consume an undue amount of time or create an unduly distracting side issue, as the court limited the state to a narrow presentation of the basic facts of the subsequent shootings, the evidence was introduced through the testimony of multiple witnesses interspersed throughout three of the nine days of trial, a limited amount of the evidence was documentary, and the prosecutor did not belabor his examination of the witnesses.

Argued October 14, 2021—officially released January 11, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of murder and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Britain and tried to the jury before *Dewey, J.*; thereafter, the court granted in part the defendant's motion to preclude certain evidence; verdict and judgment of guilty, from which the defendant appealed. *Reversed*; *new trial*.

*Jennifer B. Smith*, assistant public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Brian W. Preleski*, state's attorney, *Helen J. McLellan*, senior assistant state's attorney, and *Nancy L. Walker*, former assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Bryant Wilson, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that (1) the trial court's investigative inadequacy jury instruction deprived him of his right to present a defense, and (2) the trial court erred in admitting uncharged misconduct evidence. We reverse the judgment of conviction.

The following evidence was presented to the jury. On August 18, 2014, at approximately 10:45 p.m., the victim, Corey Washington, was shot in the abdomen while he was in the driveway of 62-64 Roberts Street in New Britain. New Britain Police Officer Brian Shea was dispatched to the scene and arrived minutes later. When Officer Shea arrived, New Britain Police Officer Lou Violette was rendering aid to the victim. The victim was transported by ambulance to the Hospital of Central Connecticut in New Britain, where he was pronounced dead at 11:24 p.m. The victim's autopsy revealed that he sustained a single gunshot wound, that the bullet entered the front of his abdomen and exited through his lower back, and that the wound was likely caused by a medium or large caliber type of bullet, such as a nine or ten millimeter, a .38 caliber, or a .44 caliber bullet.

Jerome Blackman, the boyfriend of the victim's mother, was sitting with the victim's mother in his vehicle in the backyard of 60 Roberts Street when he heard a gunshot that sounded like a "loud cannon," followed by two "pop sounds" that he also thought were gunshots, and someone running down the gravel driveway of 62-64 Roberts Street. He could not see the area behind 62-64 Roberts Street because there was a fence obstructing his view. There was a "cut-through" in the fence behind Roberts Street that led to Trinity Street.

Additional police officers arrived at the scene and conducted a search of the area in which the victim was found. The area was dark, illuminated only by scattered streetlights and officers' handheld flashlights. The police did not find any firearms or shell casings.[1] New Britain Police Officer Rafal Korczak participated in the search. He was directed to search the area of Trinity Street. He located a black and silver San Antonio Spurs cap "stuck in the bushes" next to 59 Trinity Street, which property was located directly behind 62-64 Roberts Street. Detective Kevin Artruc photographed and seized the hat. A forensic science examiner from the DNA unit of the state forensics laboratory determined that there were at least three contributors to the DNA profile on a sample taken from the Spurs cap. The defendant was included as a contributor. When later

interviewed, the defendant told the police that, on the night of the shooting, he was either at his girlfriend's house or at the home of his friend, Mark Stepney, at 10 School Street. The defendant described Stepney as "his right-hand man."

The state presented evidence that, two days after the victim was murdered, the defendant was involved in two shootings, one on Maple Street and one on Prospect Street, in which the defendant admitted to having fired a Desert Eagle .44 magnum handgun. No one was harmed in either shooting. While a police officer administered a test[2] to the defendant at the Maple Street location, the defendant said that there would probably be residue on his hands because "I like to play with guns . . . my boys have guns, a .44 magnum." The police recovered five casings from Maple Street. Detective Felix J. Perez testified that he recovered a Desert Eagle .44 magnum handgun (Desert Eagle) from underneath a parked vehicle at 10 School Street and that there was "a spent casing" inside the handgun. The defendant told Detective Thai Tran that he had possessed the gun that was recovered from 10 School Street. Forensic examination of the Maple Street casings and the spent casing found inside the Desert Eagle revealed that all of the casings had been fired from that gun.

The state presented the testimony of two jailhouse informants, Shannon Davis and Andrew El Massri.[3] Davis, the defendant's cellmate in November and December, 2014, made a request to speak with the police,[4] met with Detective Tran, and gave a written statement.[5] At trial, Davis testified that the defendant told him that he wanted to rob the victim and had a third party call the victim to set up a purchase of marijuana. Davis further testified that the defendant told him that the victim did not give up anything and that the defendant shot the victim, took off running, hopped a fence, and lost his hat. Davis testified that the defendant was concerned that the hat would be found. Davis further testified that the defendant told him that he used "a pretty big gun . . . a 40 40," "Desert Eagle" to shoot the victim, and that "it had .357 bullets in the gun." Davis testified that the defendant told him that he had "stashed the gun next to a house" and that the defendant's friend, who had brought him to the area, was waiting in a car for him on another street where there was a Chinese restaurant.[6] Davis testified that the defendant told him that, after shooting the victim, he had gotten into a shootout using a "totally different" gun. Davis testified that the defendant told him that he had a friend go back to get the Desert Eagle. Davis further testified that the defendant told him that he gave the gun to a "white dude," who gave the gun to the police.

El Massri, who was incarcerated with the defendant

in February and March, 2015, also met with Detective Tran and gave a written statement.[7] At the defendant's trial, El Massri testified that he worked as a prison barber and cut the defendant's hair. El Massri testified that the defendant told him about the crime on two occasions when he was cutting his hair and on a third occasion when the two were sitting in a bullpen. El Massri testified that the defendant told him that he and the victim were dating the same woman and had "burned down" each other's houses, and that was when the defendant decided that he was going to murder the victim. El Massri testified that the defendant told him that he and Tyrell Johnson had set up a "weed sale" so that the defendant could ambush the victim. El Massri testified that the defendant said that Johnson drove the defendant to the area where he waited with a "40 40 or Desert Eagle," and that he shot the victim "three or four times at his chest and stomach area" and took off running to "a girl's house that lived down the street." El Massri testified that the defendant told him that the shooting occurred on Martin Street and that he "put the gun outside in some bushes" and then got a ride to Middletown. El Massri testified that the defendant told him he left a black San Antonio Spurs hat when he ran from the scene and that "he was really worried about that." El Massri testified that the defendant told him that he later went back to get the gun and gave it to "a white guy named Tom," who eventually gave it to the police.

The state also introduced into evidence recordings of three phone calls the defendant had made from prison in September, 2014. In one call, the defendant directed a woman to tell someone to "check Tommy" and that he "ratted on me." In another call, he stated that the "white boy . . . downstairs from Lisa's house" "lied on me to the police." In another call, he again said that "the little white boy over there lied on me to the police . . . ."

The defendant presented the testimony of Robert M. Bloom, a law professor and expert in the area of jailhouse informants. Bloom testified that jailhouse informants are "not as reliable as normal witnesses" because they "have a huge incentive. The incentive is freedom. So, in return for their testimony, they [are] getting a huge incentive." He further testified that, "as a result of DNA exonerations, they look at some of the reasons for the exoneration. And the most recent data indicates that 17 percent of the exonerated individuals, those cases had informants testifying as to their—whatever the state wanted them to testify to, and these were individuals that were later exonerated." He further testified that the presumption in those cases is that the testimony was false. Bloom identified factors to consider when determining the credibility of a jailhouse informant, including the amount of time the informant is facing in prison; the charges pending against him;

whether there is an explicit promise and, if so, what the promises are; whether there is an implicit promise and, if so, that the inmate will testify that no one has made promises to him but will know that he will get some benefit; the informant's knowledge of the criminal justice system; the number of times the informant has met with investigators and who was present; whether there is a transcript of the meeting with the investigators; and the informant's record of convictions and any charges pertaining to the failure to tell the truth.[8]

The defendant offered an alibi defense. Lisa Vidtor, Stepney's mother, testified that the defendant was present at the Maple Street home of a mutual friend, Sherry, on the evening of the murder. Vidtor testified that the defendant, Stepney, and others were present at Sherry's house when she arrived at about 7:30 p.m., and that the defendant stayed there all night. She testified that the defendant was drinking whiskey on the downstairs porch with Stepney, and that she was "up and down the stairs" during the evening. Vidtor also could hear them on the porch, and she had gone downstairs to listen to them singing and rapping. Vidtor testified that the defendant went to bed at about "11 something."

Vidtor remembered that the date was August 18, 2014, because her electricity had been shut off and she had gone to stay at Sherry's house because of the shutoff. On rebuttal, the state presented the testimony of John Nims, a program manager for Eversource Energy. Nims testified that there was both a request for a disconnect and an actual disconnect of electricity at 10 School Street on August 19, 2014. Vidtor testified that she did not come forward earlier because the police did not come to her and question her. Detective Tran testified on rebuttal that he had called Vidtor on the telephone and went to two addresses with which she was associated to speak with her, but he was unsuccessful at connecting with her.

The defendant was charged in a long form information with murder in violation of § 53a-54a (a) and carrying a pistol without a permit in violation of § 29-35 (a). The matter was tried to a jury, *Dewey, J.*, presiding. On October 25, 2017, the jury returned a verdict of guilty of both counts. On January 3, 2018, the court sentenced the defendant to a total effective term of fifty-five years of incarceration, twenty-six years of which were a mandatory minimum, to run consecutively to a sentence the defendant already was serving. This appeal followed. Additional facts and procedural history shall be set forth as necessary to address the claims of the defendant.

I

The defendant's first claim on appeal is that the court's investigative inadequacy jury instruction, which was the model instruction provided on the Judicial Branch website at the time it was given, deprived him

of his constitutional right to present a defense of investigative inadequacy. We agree with the defendant.

The following additional procedural history is relevant to this claim. At trial, defense counsel advanced a defense that the police had conducted an inadequate investigation. He elicited testimony from Detective Tran that this was the first case he had investigated as the lead detective. In addition to eliciting testimony that there were no eyewitnesses placing the defendant at the scene and no surveillance video of the defendant, defense counsel elicited testimony regarding other potential suspects—Levert Wooten, Kenneth Lockhart, Tyrell Johnson, Marcus Baptiste, and Dijon Sackey—and challenged the lack of investigation as to these individuals.

Evidence was presented that the police interviewed Vanessa Gatson, who stated that she was walking her dog on the street when she saw someone walking up to the victim right before he was shot. Gatson stated that the person she saw walk up to the victim was wearing a hoodie with the hood up. Gatson said that she possibly could identify the person, but, subsequently, she was not able to identify the person in a photographic array.[9] On the basis of Gatson's description, the police stopped Wooten, an associate of Lockhart's, while he was walking on South Main Street. The police asked him to stop three times before he complied. Detective Tran testified that Wooten was ruled out as a suspect because there was no information or evidence that he was responsible for the shooting.

Defense counsel emphasized that, in July, 2017, he requested that the state laboratory conduct DNA testing on a Tampa Bay Rays hat that the police had discovered at 325 South Main Street on August 25, 2014. The DNA profile from the swab of the Rays hat was entered into the Combined DNA Index System and resulted in a match to a DNA sample collected from Sackey, a convicted felon. Sackey told Detective Tran that he was with Wilken Montez on the night of the shooting. Detective Tran did not interview Montez.

Defense counsel also questioned Detective Tran regarding Lockhart, whose name was mentioned as a potential suspect when Detective Tran spoke with Sackey. Surveillance video from NB Mart, a nearby mini-mart on the corner of South Main Street and Roberts Street, showed Lockhart in the mini-mart with two other people about one hour before the shooting. The police obtained surveillance video from 19-21 Roberts Street, which showed three men go into the house at that address at about 9:58 p.m. Although Detective Tran did not review the video from 19-21 Roberts Street during his investigation, he testified that the three men in the video "appeared similar" to Lockhart and the two other people in the NB Mart. Detective Tran had information that Lockhart also wore a Spurs hat. Despite knowing

that there was a mixture of DNA on the Spurs hat, Detective Tran did not interview Lockhart or take a buccal swab from him. Detective Tran also was aware that Lockhart was jumped in the neighborhood because of the victim's death and that Lockhart was a friend of Wooten.

There also was evidence that Baptiste had communicated via text message with the victim on the night of his death. The police interviewed Baptiste, who was not forthright with them. Surveillance video from NB Mart showed the victim entering the store with Baptiste at approximately 10:41 p.m. and the two engaging in a transaction. The video showed Baptiste exiting the store at 10:47 p.m., after the victim already had been shot.

Defense counsel elicited Detective Tran's testimony that Johnson, a convicted felon who had been arrested on unrelated charges, came forward on September 10, 2014, with information related to the shooting of the victim. Detective Tran interviewed Johnson, who told him that, on the night of the shooting, both he and the defendant were present on Roberts Street, Johnson had engaged in a drug transaction with the victim, and Johnson subsequently heard gunshots when he was one block away.[10] According to Detective Tran, the information received from Johnson helped Detective Tran tie the case together. During Detective Tran's testimony, the court instructed the jury: "Once again, ladies and gentlemen, the cross-examination, the information about the police investigation, what was said by the witnesses, is not intended in any way to be viewed as testimony by . . . those witnesses, the only purpose for the question, for the court allowing the questions was to give you the context of the police investigation." The court gave similar limiting instructions during the presentation of other investigation evidence.

Detective Tran testified that he believed the victim's death to be related to a drug transaction. The police seized the victim's cell phone and determined, after reviewing text messages in the days leading up to his death, that he sold drugs, including marijuana and "Molly." One of the last messages received by the victim's phone asked him if he had Molly. The police were not able to trace the number from which the message was sent. Detective Tran did not consider Johnson or Baptiste suspects in the victim's death, despite both men having engaged in drug transactions with the victim shortly before he was shot.

Following this testimony, defense counsel argued to the jury that Detective Tran was inexperienced and that the police had "made a conclusion that [the defendant] committed [the murder] and investigated it with facts to support their conclusion that they already made." Defense counsel questioned why Detective Tran did not take buccal swabs of Wooten, Lockhart, or Johnson.

He further argued that the police should have continued the investigation into Sackey after discovering his DNA on the Tampa Bay Rays hat. He highlighted evidence that both Lockhart and Baptiste were captured on surveillance video in the area and questioned why they were ruled out as suspects. He noted that Wooten, who was wearing a hoodie, was present in the area and failed to comply with police commands to stop. Defense counsel's argument focused on what he contended was the failure of the police to investigate leads and consider other individuals as suspects.

On October 6, 2017, the court requested that counsel provide the court with proposed jury instructions and notified counsel that it would provide its proposed jury instructions before the end of the day. The court stated: "And once I've seen yours, I may, I may not modify. I certainly want to have . . . a jury charge conference, where all of this can be discussed." Later that same day, the court provided counsel with copies of preliminary final instructions and marked them as a court exhibit. Defense counsel then stated: "I did file a request to charge, three different charges," and provided a copy to the court. The court stated: "All right. I'll look at these proposed charges and any others which you might have. Thank you. In light of the fact that you've given me these, I want to look at these before I give you the final, but I will e-mail them before the end of the day today."

The defendant's October 6, 2017 written request to charge, in connection with his defense of inadequate police investigation, provided: "The defense has presented evidence that the prosecution's investigation of this case has been negligent, or purposefully distorted, and not done in good faith. For example, there has been testimony about police officers not viewing crucial video evidence and officers not investigating other suspects. With respect to these items of evidence, the probative value of that evidence depends on the circumstances in which it was not investigated. If the circumstances raise a reasonable belief of bad faith, fraud or negligence, you may consider that in determining the credibility of the witnesses and the weight, if any, that you chose to give that evidence and their testimony.

"Remember, under the instructions I have given you, if the evidence permits two reasonable interpretations, you must adopt that interpretation which favors the defendant."

The defendant cited as the legal basis for his request *State* v. *Collins*, 299 Conn. 567, 599, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). The defendant recited as the factual basis for his request: "The lead detective testified that he did not review video showing that Kenneth Lockhart, a named suspect, was in the same store as the victim approxi-

mately 45 minutes before the shooting. The lead detective testified that he did not review the video showing that Lockhart was walking into a house on the same street where the victim was shot approximately 45 minutes prior to the shooting. Lockhart was named as a suspect independent of these videos. The police did not follow up on leads. The police did not interview Lockhart. The police did not attempt to obtain DNA profiles from the Tampa Bay Rays hat that was deemed to have evidentiary value. The police did not request DNA testing of the hair fibers found in the San Antonio Spurs hat.'' The defendant also requested instructions on third-party culpability and jailhouse informant testimony.

On October 7, 2017, the court e-mailed proposed jury instructions to the parties. The court's instructions included the following charge: ''You have heard argument that the police investigation was inadequate and that the police involved in this case were incompetent. The issue for you to decide is not the thoroughness of the investigation or the competence of the police. The only issue you have to determine is whether the state, in the light of all the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the counts with which he is charged.'' This proposed charge was consistent with the model criminal jury instruction on investigative inadequacy provided on the Judicial Branch website at the time it was given.

On October 10, 2017, the state filed an objection to the defendant's request to charge. Specifically, with respect to the defendant's proposed inadequate police investigation instruction, the state argued: ''The defense has not presented evidence that the police investigation was negligent, purposefully distorted or done in bad faith, or fraud. In addition, *State* v. *Collins* [supra, 299 Conn. 567], cited by the defense, does not support the requested charge.'' On the same date, the state also submitted a written request to charge. It requested language identical to the model criminal jury instruction on investigative inadequacy. The request to charge quoted, as the supporting law, the commentary to the model instruction, which provided: '' 'A defendant may . . . rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect.' *State* v. *Collins*, [supra, 599–600] (finding that such an instruction as this does not preclude the jury from considering the evidence of the police investigation as it might relate to any weaknesses in the state's case). '*Collins* does not require a court to instruct the jury on the quality of police investigation but merely holds that a court may not preclude such evidence and argument from being presented to the jury for its consideration.' *State* v. *Wright*, 149 Conn. App. 758, 773–74 [89 A.3d 458], cert. denied, 312 Conn. 917 [94

A.3d 641] (2014)."

The court held a charging conference on October 10, 2017. The court stated: "All right, Counsel, you received the request to charge on Friday. Arguments about what you want included—the defense has asked for items to be included." Defense counsel responded: "Your Honor, I believe two of our three requests were included, the adequacy and the instruction on jailhouse informants." The court responded: "Those are standard instructions, yes, they were included. The one that wasn't included . . . was the third-party culpability."[11] Defense counsel then stated that he would "rely on [his] motion" with respect to his arguments on the charge of third-party culpability. After the state argued its objection to the defendant's proposed third-party culpability instruction, the court declined to include the charge in its instructions. The court then considered two unrelated motions in limine filed by the state.

The court then returned to the jury instructions, stating: "Let's get to the instructions. Now, you received copies. I do them page at [a] time. So, any comment on page 1?" The court then asked whether there were any comments on the individual pages from one through six. Defense counsel stated that he had a requested a change on page five, which the court denied, and that he also had an objection on page six. When the court stated, "All right. Page seven," which included the investigation instruction, the state raised a point regarding a different instruction on that page. Following resolution of the state's point, the court turned to page eight and then to page nine. Subsequently, the court stated: "Page 10? 11? 12? 13? 14? 15? And 16? All right. That is it, then." Defense counsel then asked whether the clerk would be making copies of the charge because a few changes had been made, and the court responded that copies would be made. Copies were provided to counsel following the charging conference.

The next day, the court instructed the jury.[12] The court provided the investigative inadequacy charge in accordance with its proposed charge, which, as noted previously, was consistent with the model jury charge at the time. At the conclusion of its charge, the court did not ask whether there were any objections, and defense counsel did not object to the charge as given.

As a threshold matter, we first address the state's contentions that the defendant waived his claim of instructional error (1) by changing his claim on appeal and (2) under the rule articulated in *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011), and that he cannot prevail under the plain error doctrine. See Practice Book § 60-5.

A

Preservation

We first address whether the defendant preserved

his claim of instructional error. The defendant argues that his claim was properly preserved on the basis of his having filed a written request to charge. We agree with the defendant.

"[O]ur rules of practice permit criminal defendants to preserve claims of instructional error by filing a timely written request to charge." *State* v. *Ramon A. G.*, 336 Conn. 386, 396, 246 A.3d 481 (2020); see also Practice Book § 42-16.[13] "[A] party may preserve for appeal a claim that an instruction . . . was . . . defective either by: (1) submitting a written request to charge covering the matter; or (2) taking an exception to the charge as given." (Internal quotation marks omitted.) *State* v. *King*, 289 Conn. 496, 505, 958 A.2d 731 (2008).

"Under either method [of submitting a written request to charge or taking an exception to the charge as given], some degree of specificity is required, as a general request to charge or exception will not preserve specific claims. . . . Thus, a claim concerning an improperly delivered jury instruction will not be preserved for appellate review by a request to charge that does not address the specific component at issue . . . or by an exception that fails to articulate the basis relied upon on appeal with specificity." (Citations omitted.) *State* v. *Johnson*, 165 Conn. App. 255, 284–85, 138 A.3d 1108 (claim preserved where defendant filed request to charge and trial court's charge deviated as to specific component from proposed instructions), cert. denied, 322 Conn. 904, 138 A.3d 933 (2016); see also *State* v. *Ramos*, 261 Conn. 156, 170–71, 801 A.2d 788 (2002) ("[i]t does not follow, however, that a request to charge addressed to the subject matter generally, but which omits an instruction on a specific component, preserves a claim that the trial court's instruction regarding that component was defective" (emphasis omitted)), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014); *State* v. *Lee*, 138 Conn. App. 420, 453 n.19, 52 A.3d 736 (2012) ("[i]n order to preserve an objection to a proposed jury instruction, the defendant must plainly put the trial court on notice as to the specific basis for his objection" (internal quotation marks omitted)), rev'd in part on other grounds, 325 Conn. 339, 342, 157 A.3d 651 (2017). Our Supreme Court never has "required, however, a defendant who has submitted a request to charge also to take an exception to a contrary charge, and such a requirement would contravene the plain language of [Practice Book § 42-16]." (Internal quotation marks omitted.) *State* v. *Johnson*, 316 Conn. 45, 54, 111 A.3d 436 (2015).

The defendant in the present case filed a written request to charge. "The question, then, is whether that request sufficiently covered the matter so as to preserve the issue for appellate review. Put differently, the relevant inquiry is whether the defendant's request to charge alerted the trial court to the specific deficiency

now claimed on appeal." *State* v. *Ramon A. G.*, 190 Conn. App. 483, 493–94, 211 A.3d 82 (2019), aff'd, 336 Conn. 386, 246 A.3d 481 (2020).

We conclude that the defendant's request sufficiently covered the matter. In his principal brief, the distinct claim presented by the defendant was that "[t]he trial court's instructions, which effectively told the jury to ignore the defendant's defense, violated his constitutional rights to due process and to present a defense." Specifically, the defendant contended that "[t]he defense elicited evidence that the police failed to treat four men as suspects and adequately investigate them, even though they were in close vicinity right around the time of the murder. The police failed to take their DNA samples . . . . The trial court's instruction directed the jury to disregard the adequacy of the investigation as it related to the strength of the state's case and disregard the defendant's theory of the case."

Following the filing of the parties' initial briefs in this case, this court granted the defendant's motion to stay the appeal pending our Supreme Court's decision in *State* v. *Gomes*, 337 Conn. 826, 853, 256 A.3d 131 (2021). In *Gomes*, our Supreme Court held that the model jury instruction "failed to inform the jury not only of a defendant's right to rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt . . . but also the jury's concomitant right to consider any such deficiencies in evaluating whether the state has proved its case beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) Id. Following the release of *Gomes*, the parties filed supplemental briefing in this case. In the defendant's supplemental brief, he argues that *Gomes* is controlling and requires reversal in the present case.

The state argues that the defendant's claim on appeal is "substantially different" from that raised at trial. We disagree that the claim is different such that it necessitates a conclusion that his claim is unpreserved. We note that the defendant filed a request to charge seeking language different from, and more comprehensive than, that contained in the model charge on investigative inadequacy. Also, the defendant's requested charge omitted the language that our Supreme Court found to have presented a significant risk of misleading the jury; specifically, it omitted the instruction that "the adequacy of the police investigation was *not* for it to decide" and that "the '*only*' issue for the jury was whether the state had proven the defendant's guilt beyond a reasonable doubt." (Emphasis in original.) *State* v. *Gomes*, supra, 337 Conn. 854. Accordingly, we conclude that the defendant's request sufficiently covered the matter such that his appellate claim is preserved.

B

Waiver

We turn next to the question of whether the defendant waived his preserved claim of instructional error. The state argues that the defendant implicitly had waived appellate review of his claim under the rule articulated in *State* v. *Kitchens*, supra, 299 Conn. 483. Under the circumstances of the present case, we find no waiver.

"Whether a defendant has waived the right to challenge the court's jury instructions involves a question of law, over which our review is plenary. . . . The doctrine of implied waiver is based on the idea that counsel had sufficient notice of . . . the jury instructions and was aware of their content . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Lanier*, 205 Conn. App. 586, 622–23, 258 A.3d 770, cert. granted, 338 Conn. 910, 258 A.3d 1280 (2021).

In *Kitchens*, the defendant had neither filed a written request to charge nor taken an exception to the charge after it was delivered, and he sought review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). *State* v. *Kitchens*, supra, 299 Conn. 463, 465. Our Supreme Court concluded that, in such circumstances, an implied waiver is manifested under the following conditions: "[W]hen the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id., 482–83. "The court [in *Kitchens*] explained that affirmative acceptance meant that counsel would need to express satisfaction with the instruction, not merely acquiesce to it." *State* v. *Johnson*, supra, 316 Conn. 53.

Following *Kitchens*, our Supreme Court, in *State* v. *Paige*, 304 Conn. 426, 443, 40 A.3d 279 (2012), explained that different circumstances are presented when a defendant has filed a request to charge. "The issue of waiver in the context of a claim of instructional error typically arises when considering whether a defendant is entitled to review of an unpreserved claim. . . . In such cases, the defendant has failed to follow one of the two routes by which he or she could preserve the claim of instructional error, by either submitting a written request to charge on the matter at issue or taking an exception immediately after the charge is given. . . . We never have required, however, a defendant who has submitted a request to charge also to take an exception to a contrary charge, and such a requirement would contravene the plain language of [Practice Book § 42-16]." (Citations omitted.) Id., 442–43. The court in *Paige* stated: "Nonetheless, even if a claim of instructional

error is initially preserved by compliance with Practice Book § [42-16], the defendant may thereafter engage in conduct that manifests an intention to abandon that claim. See *State* v. *Thomas W.*, [301 Conn. 724, 732, 22 A.3d 1242 (2011)] (waiver found when, after defendant objected to proposed instruction, he expressed satisfaction with trial court's proposed curative instruction and did not thereafter object to instruction as given); *State* v. *Mungroo*, 299 Conn. 667, 676, 11 A.3d 132 (2011) (waiver found when, after reviewing court's charge that differed from defendant's proposed instruction at charging conference, defense counsel withdrew his request to charge and accepted trial court's charge); *State* v. *Whitford*, 260 Conn. 610, 632–33, 799 A.2d 1034 (2002) (waiver found when defendant objected to initial instruction, trial court issued supplemental instruction after receiving input from defense counsel, and defense counsel did not object to instruction as given); *State* v. *Jones*, 193 Conn. 70, 87–88, 475 A.2d 1087 (1984) (waiver found when defendant timely took exception after instruction was given, court consulted with defendant in fashioning supplemental instruction and defendant raised no further objection to either initial charge or supplemental instruction). In each of these cases, the trial court had taken some curative action to address the defendant's initial objection or the defendant had engaged in affirmative conduct that unequivocally demonstrated his intention to abandon the previously preserved objection, such as withdrawing a request to charge." *State* v. *Paige*, supra, 443.

In *Paige*, the court noted that the defendant never had withdrawn her request to charge and that there was "nothing in the record to suggest that the trial court understood her to have done so." Id., 444. The court determined that the "evidence [was] at best ambiguous as to whether the defendant effectively withdrew her request to charge that initially preserved [the] issue for appeal." Id.

In *State* v. *Johnson*, supra, 316 Conn. 52, 55, in which the defendant filed a written request to charge on the issues of constructive and nonexclusive possession, our Supreme Court had occasion to apply what it described as the "heightened standard" it had articulated in *State* v. *Paige*, supra, 304 Conn. 443. In *Johnson*, the trial court provided "both a 'rough' draft instruction and its proposed final instruction to counsel, and asked them on several occasions to review and comment on them." *State* v. *Johnson*, supra, 55. The court did not substitute different language for that requested by the defendant. Id. Rather, it "selectively omitted certain paragraphs altogether." Id., 56. Moreover, "[t]here was never any discussion relating to this charge or this element of the offenses. The defendant never stated that she was withdrawing her request to charge on possession. After the initial draft was submitted for counsel's review, the defendant requested and successfully obtained the

addition of an instruction on inconsistent statements, a matter on which the defendant also had filed a request to charge. When the court twice asked in succession whether the defendant had objections to the instructions just before the charge was given to the jury, defense counsel twice stated that he had no objection." Id.

On the basis of the record in *Johnson*, our Supreme Court was not persuaded that the facts rose "to the level of the type of affirmative conduct that unequivocally demonstrated an intention to abandon the request for a more comprehensive charge on possession." Id. The court reasoned that the "[t]he defendant reasonably could have interpreted the trial court's selective adoption of parts of her possession instruction as a purposeful rejection of the omitted language. . . . [T]he defendant was not required to object to the truncated instruction to preserve her request for the more comprehensive instruction." Id. Moreover, the court stated that defense counsel's "statement that he had no objection to the final instruction may simply have been intended to convey agreement that the language provided, much of which related to matters on which the defendant submitted no requests to charge, was a correct statement of the law, rather than satisfaction with the omission of language that defense counsel specifically had requested and reasonably could have believed had been intentionally rejected." Id. Last, the court stated that defense counsel's "request for the addition of an instruction on inconsistent statements, which defense counsel reasonably could have interpreted as having been inadvertently omitted, does not unambiguously indicate that he was effectively withdrawing his request for a more expansive instruction on possession." Id., 56–57.

As noted previously, the defendant in the present case filed a request to charge on investigative inadequacy. Although the court's preliminary draft instructions included the model jury instruction rather than the defendant's requested charge, defense counsel stated, during the charging conference, that he believed that "two of our three requests were included, the adequacy and the instruction on jailhouse informants." The court responded: "Those are standard instructions, yes, they were included." The following day, the court instructed the jury using the model jury instruction. The defendant took no exceptions to the charge.

Under the guidance of *Paige* and *Johnson*, we conclude that these facts do not demonstrate an abandonment of the defendant's request for his proposed jury instruction regarding investigative inadequacy. First, we note that the defendant did not withdraw his request to charge. See *State* v. *Johnson*, supra, 316 Conn. 56; *State* v. *Paige*, supra, 304 Conn. 444. Second, our review of the record of the charging conference reveals nothing demonstrating "the type of affirmative conduct that

unequivocally demonstrate[s] an intention to abandon the request" for a jury instruction on investigative inadequacy. *State* v. *Johnson*, supra, 56. Defense counsel's statement during the charging conference that he believed that "two of our three requests were included, the adequacy and the instruction on jailhouse informants," was ambiguous. As such, we do not view it as effectively withdrawing his request or expressing approval of the court's proposed charge. See *State* v. *Paige*, supra, 445 (defense counsel's response, "[o]kay. Thank you," to court's confirmation that it was planning to give charge requested by state was ambiguous comment that could not be considered to effectuate withdrawal of request to charge on that issue). A reasonable reading of defense counsel's statement is that he was mistaken as to the content of the court's proposed charge and that he wrongly believed that the court had included his proposed investigative inadequacy charge.

Moreover, with respect to the trial court's reply that, "[t]hose are standard instructions, yes, they were included," defense counsel reasonably could have concluded that the trial court's adoption of the model instruction constituted a rejection of the instruction he proposed in his written request to charge. See *State* v. *Johnson*, supra, 316 Conn. 56 (defendant reasonably could have interpreted trial court's selective adoption of parts of her possession instruction as purposeful rejection of omitted language). Subsequent to this exchange, the prosecutor sought to confirm that the court intended to "instruct the jury based on the proposed instructions that were given to counsel." The prosecutor stated: "I know that Your Honor did include an instruction on jailhouse informants and an instruction on completeness of the police investigation. I believe Your Honor's instructions are appropriate. *I objected to the defendant's specific request.*" (Emphasis added.) The court responded: "Well, at the time I gave you the instructions, to be quite honest, that was just the time, exactly the time that I received his request to charge, so I did want to consider those as well." A reasonable reading of the prosecutor's comments referring back to the state's objection is that he did not believe the defendant's request had been effectively withdrawn. Accordingly, we conclude that the defendant did not abandon his request.

C

Merits

Having concluded that the defendant preserved his claim and did not waive it, we turn to its merits. The defendant argues that the trial court's issuance of the model police investigation instruction was erroneous. The state agrees that, "[i]f this Court finds that the defendant did not waive the instructional error raised on appeal, the defendant has shown, pursuant to *Gomes* . . . that the trial court erred in giving the model

instruction regarding the adequacy of police investigation." The parties disagree, however, as to whether the error was harmless. The defendant maintains that the giving of "the model instruction was extremely harmful because it instructed the jury to disregard evidence about the inadequate investigation—the defendant's theory of defense." The state argues that the error was harmless beyond a reasonable doubt. We agree with the defendant that there is a reasonable possibility that the jury was misled by the trial court's investigative inadequacy instruction, and, therefore, the defendant is entitled to a new trial.

The following well established legal principles guide our analysis of the defendant's claim. "[A] fundamental element of due process of law is the right of a defendant charged with a crime to establish a defense. . . . Where . . . the challenged jury instructions involve a constitutional right, the applicable standard of review is whether there is a reasonable possibility that the jury was misled in reaching its verdict. . . . In evaluating the particular charges at issue, we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Collins*, supra, 299 Conn. 598–99. "If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n error in instructions in a criminal case is reversible error when it is shown that it is reasonably possible for errors of constitutional dimension or reasonably probable for nonconstitutional errors that the jury [was] misled." (Citations omitted; internal quotation marks omitted.) *State* v. *Aviles*, 277 Conn. 281, 309–10, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). "A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Gomes*, supra, 337 Conn. 849–50.

In *State* v. *Gomes*, supra, 337 Conn. 828–29, the defendant was convicted of assault in the second degree following a fight at a sports club in Bridgeport. The "main defense advanced by the defendant was that the police had conducted an inadequate investigation of the incident." Id., 832. The defendant sought to persuade the jury that reasonable doubt existed as to the victim's identification of the defendant as the person who had assaulted her. Id. The defendant adduced the testimony

of the first two police officers to arrive at the scene of the fight. Id., 848. They testified that they were informed by the police dispatcher that Raphael Morais was a suspect in the assault. Morais was present at the club and was beaten by several club patrons immediately following the assault of the victim, but the police did not investigate him as a suspect. Id. Moreover, the detective who conducted the interviews stated that he viewed Morais as a witness or victim but not as a suspect. Id. The officers testified that, although they were approached at the scene of the fight by several people claiming to have information about the assault, the officers did not ask for their names or contact information or attempt to interview them regarding what they had seen. Id. On the basis of this evidence and other evidence at trial, the defendant contended that, had the police conducted an adequate investigation, they would have realized that the victim had misidentified him. Id., 847.

Defense counsel in *Gomes* stated in closing arguments that the police did not identify the crime scene, take any photographs of the scene so that the jurors could see the lighting, or attempt to obtain any surveillance video. Id., 832. The defendant filed a written request to charge the jury, which provided in relevant part: "[1] You have heard some arguments that the police investigation was inadequate and biased. [2] The issue for you to decide is not the thoroughness of the investigation or the competence of the police. [3] However, you may consider evidence of the police investigation as it might relate to any weaknesses in the state's case. [4] Again, the only issue you have to determine is whether the state, in light of all the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the counts with which he is charged." (Internal quotation marks omitted.) Id., 833. During the charging conference, the court informed defense counsel that it would be giving a charge "on the adequacy of the police investigation, in a form that was somewhat similar to the defendant's requested instruction, but that [its instruction] may be a little bit different." (Internal quotation marks omitted.) Id.

The court in *Gomes* instructed the jury using the model jury instruction: "You have heard some arguments that the police investigation was inadequate and that the police involved in the case were incompetent or biased. The issue for you to decide is not the thoroughness of the investigation or the competence of the police. The only issue you have to determine is whether the state, in light of all the evidence before you has proved beyond a reasonable doubt that the defendant is guilty of the counts with which he was charged." (Internal quotation marks omitted.) Id. "Defense counsel objected to the court's omission of point three of his requested instruction." Id., 833–34.

On appeal, our Supreme Court held that the model jury instruction "failed to inform the jury not only of a defendant's right to 'rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt' . . . but also the jury's concomitant right to consider any such deficiencies in evaluating whether the state has proved its case beyond a reasonable doubt." (Citation omitted.) Id., 853, quoting *State* v. *Collins*, supra, 299 Conn. 599–600. The court stated: "Although the model instruction is similar to the instructions this court approved in [*State* v. *Williams*, 169 Conn. 322, 335–36 nn.2–3 and 336, 363 A.2d 72 (1975)] and *Collins* because it informs the jury not to consider investigative inadequacy 'in the abstract' . . . the model instruction, unlike the instructions in *Williams* and *Collins*, improperly fails to inform the jury that a defendant may present evidence of investigative inadequacy in his or her *particular* case. Indeed, as the defendant argues, the model instruction omits the very language that the court in *Collins* determined rendered the instruction in that case acceptable because it (1) apprised the jury that 'the defendant was entitled to make an investigation and put his evidence before [it],' and (2) directed the jury to determine, based on '*all the evidence* before [it],' including evidence presented by the defendant, whether the state had proved the defendant's guilt beyond a reasonable doubt. . . . The language that the defendant requested be added to the model jury instruction—i.e., that the jury 'may consider evidence of the police investigation as it might relate to any weaknesses in the state's case'—would have similarly apprised the jury of the defendant's right to present an investigative inadequacy defense and the jury's right to consider it in evaluating the strength of the state's case."[14] (Citations omitted; emphasis in original.) *State* v. *Gomes*, supra, 337 Conn. 853–54.

We agree with the parties that *Gomes* is controlling in the present case. As in *Gomes*, the court gave the model jury instruction ultimately rejected by our Supreme Court. In reliance on *Gomes*, we conclude that the court erred in giving the model instruction.

We next turn to whether the error in the instructions constitutes reversible error. As the court in *Gomes* concluded, "there is a significant risk that the instruction given by the trial court misled the jury to believe that it could *not* consider the defendant's arguments concerning the adequacy of the police investigation. Although the first sentence of the instruction acknowledged that the defendant made arguments that the police had failed to investigate adequately the crime in question, in the very next sentence, the jury was instructed that the adequacy of the police investigation was *not* for it to decide. This admonishment was reinforced by the third and final sentence that the *only* issue for the jury to decide was whether the state had

proven the defendant's guilt beyond a reasonable doubt. . . . Thus, rather than apprising the jury that reasonable doubt could be found to exist if the jury conclude[d] that the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits . . . there is a reasonable possibility that the instruction had the opposite effect and caused the jury to believe that it was *prohibited* from considering any such evidence." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 854–55.

For the same reasons expressed in *Gomes*, we conclude that it is reasonably possible that the jury in the present case was misled to believe that it could not consider the defendant's arguments regarding the adequacy of the police investigation. Moreover, the court in *Gomes* further considered "the relative weakness of the state's case" in determining that the instructional error was harmful to the defendant. Id., 855. In the present case, the state's case was not strong, as the primary evidence consisted of the testimony from two jailhouse informants who recounted inculpatory statements made by the defendant in exchange for beneficial treatment in their own pending criminal matters. In fact, in closing arguments, the prosecutor stated that, "the most significant witnesses, in addition to Mr. Blackman, are Mr. Davis and Mr. El Massri, also Detective [Raymond] Grzegorzek and Detective Tran."

The physical evidence focused on the hat found "stuck in the bushes" near the crime scene. Although the defendant was deemed a contributor to the DNA found on the hat, there were two other contributors to the DNA on the hat. Moreover, as Officer Korczak testified, the hat was found "stuck in the bushes," which defense counsel argued was not consistent with a hat falling off while an individual was running away. There also was no evidence outside of the jailhouse informant testimony that the victim's assailant wore a hat. The gun that the state alleged to have been used in the homicide was problematic in that there was no forensic evidence linking it to the shooting of the victim. Indeed, there were no casings located at the scene. Moreover, there were no eyewitnesses to the shooting, and the defendant did not appear on any of the surveillance videos obtained by the police. Defense counsel sought to amplify the weaknesses in the state's evidence by highlighting for the jury claimed inadequacies in the police investigation, including the failure to investigate other potential suspects. On the basis of this record, we conclude that there is a reasonable possibility that the jury was misled by the trial court's investigative inadequacy instruction, and, therefore, the defendant is entitled to a new trial.

II

Although our conclusion in part I of this opinion

is dispositive of the present appeal, we address the defendant's claim that the trial court improperly admitted uncharged misconduct evidence because it has been raised and fully briefed and is likely to arise on remand. See, e.g., *State* v. *Chyung*, 325 Conn. 236, 260 n.21, 157 A.3d 628 (2017) (addressing claim that court abused its discretion in admitting evidence of uncharged misconduct because issue was likely to arise on remand). We disagree with the defendant that the court abused its discretion.

The following additional facts and procedural history are relevant to the resolution of this claim. On December 30, 2014, the defendant filed a motion for disclosure of uncharged misconduct. On August 23, 2017, the state filed a notice of uncharged misconduct. The state sought to introduce evidence, inter alia, of (1) the facts of two shootings occurring on August 21, 2014, one on Maple Street and one on Prospect Street; (2) the defendant's statements to a detective admitting involvement in the Maple Street and Prospect Street shootings and that he used a Desert Eagle in those shootings; (3) the defendant's statement in the presence of a police officer after the Maple Street incident that, "I like to play with guns . . . my boys have guns, a .44 magnum"; and (4) the defendant's guilty pleas to the charges arising out of the Maple Street and Prospect Street shootings. The defendant filed a September 5, 2017 motion in limine seeking to preclude admission of the evidence.

On September 18, 2017, the state filed a memorandum of law in support of its notice of uncharged misconduct and responding to the objections raised by the defendant in his motion in limine. In its memorandum of law, the state argued, inter alia, that statements made by the defendant regarding acquisition of the firearm used in the homicide and the Maple Street shooting were relevant to means and opportunity to commit the murder. It further argued that the statements put into context crucial prosecution testimony and completed the story of the crime. The state argued that the defendant's statement that he liked to play with guns was relevant to the issue of motive, means, and opportunity to commit the crime, and it put into context crucial prosecution testimony. The state also argued that the facts of the Prospect Street shooting, the defendant's admissions with respect thereto, and the defendant's statements regarding his possession of the Desert Eagle were relevant to "intent, identity, motive, means and opportunity to commit the murder, it places into context crucial prosecution testimony and is so factually and legally connected to the homicide that it completes the story of the charged crime of murder and pistol without a permit."

On September 18, 2017, the defendant filed a second motion in limine in response to the state's memorandum of law. A hearing also was held on September 18. The

state additionally argued during the hearing that evidence of the use of the firearm in the two other shootings went to the issue of operability. The defendant argued, inter alia, that the evidence sought to be introduced by the state was irrelevant and more prejudicial than probative.

On September 22, 2017, the court issued its memorandum of decision with respect to the motion in limine regarding uncharged misconduct. With respect to the defendant's statement that he liked to play with guns, the court determined that it was admissible as an admission of a party opponent and was relevant to intent to commit murder, as well as to identity, means, and opportunity, and that it was relevant to the element of possession required for conviction of the charge of carrying a pistol without a permit.[15] The court found the statement "highly relevant." The court noted: "In determining prejudice, this court is considering whether the evidence tends to evoke an emotional bias against the defendant. There is always some prejudice from highly probative evidence."

As to the defendant's statements regarding the Maple Street and Prospect Street shootings, the court stated that they were admissions of a party opponent admissible to prove "the defendant's specific intent to commit murder and the identity of the person who shot the decedent. . . . It is also relevant evidence of a critical element of the second offense charged. It also is relevant as indicative of the means and opportunity to commit the offense charged." The court found that "[t]he highly probative evidence is prejudicial, but the prejudicial impact does not outweigh its probative value."

The court next determined that the defendant's guilty pleas to the Maple Street and Prospect Street shootings were admissible. The court stated: "The evidence should be admitted to prove the defendant's specific intent to commit murder and the identity of the person who shot the decedent. It also is relevant as indicative of the means and opportunity to commit the offense charged. Finally, it is relevant evidence of a critical element of the second offense charged." The court found that "[t]he highly probative evidence is prejudicial, but the prejudicial impact does not outweigh its probative value."

Finally, the court determined that the defendant's statements regarding the Desert Eagle also were admissions of a party opponent and should be "admitted to prove the defendant's specific intent to commit murder and the identity of the person who shot the decedent. It also is relevant as indicative of the means and opportunity to commit the offense charged. Finally, it is relevant evidence of a critical element of the second offense charged." The court found that the "highly probative evidence is prejudicial, but the prejudicial impact does not outweigh its probative value." The court stated that

it would give the jury a limiting instruction with respect to each instance of uncharged misconduct.

On September 25, 2017, the first day of evidence, the defendant filed a motion in limine requesting that the court reconsider its September 22, 2017 ruling on uncharged misconduct. Specifically, he reiterated his arguments that the evidence was not relevant and that its probative value was outweighed by the danger of unfair prejudice. He requested, inter alia, that, in the event the court allowed the defendant's statements into evidence, the evidence must be strictly limited to the proffered statements and that additional factual circumstances surrounding the two shootings should not be admitted into evidence.

Before and in relation to the expected testimony of Detective Grzegorzek, there was an extensive and thorough colloquy between the state, defense counsel, and the court with respect to the limitations to be imposed on the evidence regarding the Maple Street and Prospect Street shootings. At the conclusion of these discussions, the court stated that it was admitting evidence that "[the shootings] happened, there was a discharge, there was a gun," and that the police found a 40 40 Desert Eagle and the defendant admitted to using the gun. Detective Grzegorzek testified that, on August 21, 2014, at approximately 12:45 a.m., shots were fired at 213 Maple Street in New Britain, the home of the defendant's girlfriend, Josslin Kinsey. Detective Grzegorzek further testified as to a second incident occurring on August 21, 2014, at approximately 8:45 a.m., in which gunshots were fired at 66 Prospect Street in New Britain, where the defendant lived with his family on the second floor. Detective Grzegorzek testified that no one was injured in either the Maple Street or Prospect Street shootings. Detective Grzegorzek testified that he located the defendant that same day in Middletown and that the defendant agreed to speak with Detective Grzegorzek at the New Britain Police Department. Detective Grzegorzek testified that he asked the defendant about the shooting of the victim and the shootings at Maple Street and Prospect Street. Detective Grzegorzek testified that the defendant initially denied any involvement in all three incidents but later admitted to Detective Grzegorzek that he had fired the gunshots in both the Maple Street and Prospect Street shootings using the Desert Eagle. Detective Grzegorzek testified that a firearm was recovered following the Prospect Street shooting. On cross-examination, Detective Grzegorzek testified that officers recovered five shell casings from the scene of the Maple Street shooting and one shell casing from the Prospect Street shooting. No limiting instruction was requested or provided following Detective Grzegorzek's testimony.

New Britain Police Officer David Tvardzik, who was dispatched to 213 Maple Street on the report of shots

fired, also testified at trial. Over the defendant's objection, Officer Tvardzik testified that, while another officer administered a test to the defendant; see footnote 2 of this opinion; the defendant stated that there would probably be residue on his hands because "I like to play with guns . . . my boys have guns, a .44 magnum." The court gave the jury a contemporaneous limiting instruction.[16] Officer Tvardzik further testified that five shell casings were recovered from the scene of the Maple Street shooting.

Before Detective Perez testified, the defendant again objected to the anticipated evidence regarding the Desert Eagle, the shell casings from the Prospect Street and Maple Street shootings, and the firearms analysis. Specifically, he objected on the grounds that such evidence was not relevant and that it was more prejudicial than probative as well as cumulative. Before issuing its ruling, the court stated, as defense counsel had argued, that the challenged evidence was creating "a trial within a trial" and further stated, "I think I tried to make it really clear that I'm trying to focus on Roberts Street and not Maple and Prospect." With that preface, the court permitted the state to introduce into evidence the Desert Eagle to establish means and opportunity and as relevant to the elements involved in the charge of carrying a pistol without a permit, the firearms analysis to establish operability, and the casing located in the gun at the time of its recovery because "it jammed." The court found that the relevance of the five casings from the Maple Street shooting was outweighed by its prejudicial impact.[17] Defense counsel stated: "[I]f the court is allowing the one shell from . . . Prospect Street, I think it would just be consistent to allow the other shells because the jury has already heard that, so I'd ask that that be allowed in. However, I still continue to object to all of the shells. I don't believe that it's relevant at all."

Detective Perez testified that there was a spent casing inside the Desert Eagle when he recovered it from underneath a parked vehicle at 10 School Street.[18] Detective Perez further testified as to the five Maple Street casings, which were admitted into evidence along with the single casing that was found inside the Desert Eagle when he recovered it. Detective Perez testified, on cross-examination, that dropping a firearm could cause an accidental discharge, which could cause the firearm to jam. No contemporaneous limiting instruction was requested or provided following Detective Perez' testimony.

Arielle Van Deusen, a state firearms examiner, testified that she physically examined the Desert Eagle and noted "a little bit of rust to the firearm. So, it wasn't properly maintained or may have gotten damaged from some type of moisture, but otherwise it functions as expected." Van Deusen testified that "[r]ust can cause

the firearm to not function always as properly as it should. It could cause it to stick, to be slower to move or it could also cause things to not—the cartridge cases to not eject or extract as they should." Van Deusen test-fired the Desert Eagle and determined that it was operable. Van Deusen testified that the Desert Eagle had fired the casings from both the Maple Street and Prospect Street shootings. Photographs of the comparisons Van Deusen made also were entered into evidence. During Van Deusen's testimony, the court instructed the jury that the evidence of "other actions that took place" was admitted solely to show identity and the elements of the crimes of murder and carrying a pistol without a permit.

On the basis of the court's ruling that the defendant's guilty pleas regarding the Maple Street and Prospect Street shootings were admissible, the defendant agreed to stipulate that he had pleaded guilty to attempted assault in the first degree and reckless endangerment in the first degree with respect to those shootings, and the stipulation was read to the jury. No contemporaneous limiting instruction was requested or provided following the reading of the stipulation.

We first set forth applicable legal principles. "[A]s a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . The well established exceptions to the general prohibition against the admission of uncharged misconduct are set forth in § 4-5 [c] of the Connecticut Code of Evidence, which provides in relevant part that [e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. . . . We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions [set forth in § 4-5 (c) of the Connecticut Code of Evidence]. . . . Second, the probative value of the evidence must outweigh its prejudicial effect. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling. . . .

"In determining whether the prejudicial effect of otherwise relevant evidence outweighs its probative value, we consider whether: (1) . . . the facts offered may unduly arouse the [jurors'] emotions, hostility or sympa-

thy, (2) . . . the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) . . . the evidence offered and the counterproof will consume an undue amount of time, and (4) . . . the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Raynor*, 337 Conn. 527, 561–62, 254 A.3d 874 (2020).

"We are mindful that [w]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact . . . we have found no abuse of discretion. . . . Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct. . . . Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting from the admission of such evidence." (Internal quotation marks omitted.) *State* v. *Berrios*, 187 Conn. App. 661, 697, 203 A.3d 571, cert. denied, 331 Conn. 917, 204 A.3d 1159 (2019).

The defendant argues on appeal that, "[a]lthough evidence that the defendant possessed and fired the Desert Eagle three days after the murder was relevant and probative, the trial court abused its discretion in admitting the extraneous facts of both shootings, the defendant's guilty pleas to both shootings, Officer Tvardzik's testimony that he heard the defendant say, 'I like to play with guns . . . my boys have guns, a .44 magnum,' the shell casings from both incidents, photographs of the shell casings, and testimony about the recovery of and testing of the shell casings." The defendant argues that anything beyond evidence that he admitted to firing the Desert Eagle three days after the murder, as relevant to prove means, opportunity and identity, was "irrelevant, needlessly cumulative to the defendant's admissions, and unduly prejudicial."

We first address the relevance of the challenged evidence. The defendant concedes the relevance of evidence that he possessed and fired the Desert Eagle three days after the victim's death but argues that any evidence beyond that, including the facts of the shootings, the guilty pleas, his statements, and the shell casings and related evidence, was irrelevant. We disagree.

"Within the law of evidence, relevance is a very broad concept. Evidence is relevant if it has *any* tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . .

Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact *even to a slight degree*, [as] long as it is not prejudicial or merely cumulative." (Emphasis in original; internal quotation marks omitted.) *State* v. *Collins*, supra, 299 Conn. 587 n.19. On the basis of this broad definition of relevancy, we cannot conclude that the challenged evidence was irrelevant. See id. (rejecting distinction drawn by defendant between simple prior possession of murder weapon and its actual use in shooting several months prior to charged murder). Accordingly, we turn to an analysis of the degree to which the prejudicial effect of the relevant evidence outweighs its probative value.

As found by the trial court, the probative value of the uncharged misconduct, which occurred in close temporal proximity to the charged murder, was high. The evidence of the two subsequent shootings, which connected the defendant with the gun alleged by the state to have been used in the homicide, and his ensuing guilty pleas, were probative of the defendant's means and opportunity to commit the charged crimes. Likewise, the defendant's statement, "I like to play with guns . . . my boys have guns, a .44 magnum," was equally probative of the defendant's means and opportunity to commit the charged crimes. Finally, the spent casing found inside the Desert Eagle and Van Deusen's related testimony were probative in that they explained the lack of casings found at the scene of the homicide. As the trial court found, the casing found inside the Desert Eagle was relevant to whether the gun jammed. Given that the probative value of the challenged evidence was high, it would be "outweighed only upon a showing of a high degree of prejudice." *State* v. *Morel*, 172 Conn. App. 202, 230, 158 A.3d 848, cert. denied, 326 Conn. 911, 165 A.3d 1252 (2017).

With respect to the prejudicial effect of the evidence, we first consider whether the facts offered may unduly arouse the jurors' emotions or hostility. Our Supreme Court has "repeatedly held that [t]he prejudicial impact of uncharged misconduct evidence is assessed in light of its relative viciousness in comparison with the charged conduct. . . . The rationale behind this proposition is that the jurors' emotions are already aroused by the more severe crime of murder, for which the defendant is charged, and, thus, a less severe, uncharged crime is unlikely to arouse their emotions beyond that point. The question of whether the evidence is unduly prejudicial, however, does not turn solely on the relative severity of the uncharged misconduct.

Instead, prejudice is assessed on a continuum—on which severity is a factor—but whether that prejudice is undue can only be determined when it is weighed against the probative value of the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Raynor*, supra, 337 Conn. 562–63.

In the present case, the Maple Street and Prospect Street shootings were significantly less severe than the charged crimes, which included the charge of murder. Specifically, no one was injured in either subsequent shooting. See, e.g., *State* v. *Campbell*, 328 Conn. 444, 523, 180 A.3d 882 (2018) (shooting at home where defendant believed victim to be staying less vicious than shooting three victims in head at close range). Moreover, the misconduct evidence was presented primarily through the testimony of police officers and state laboratory personnel who investigated the shootings. Cf. *State* v. *Raynor*, supra, 337 Conn. 564 (evidence regarding separate shooting could arouse jurors' emotions where evidence included victim's detailed testimony about shooting, including her feelings of being scared and her actions during shooting). Thus, it is unlikely that the facts of the two subsequent shootings and the evidence related thereto unduly aroused the jurors' emotions.

Moreover, the uncharged misconduct evidence did not create an unduly distracting side issue. Although there was extensive and repeated argument outside the presence of the jury as to the admissibility of the misconduct evidence, the state's presentation of the evidence to the jury was not unduly distracting. First, the court restricted testimony to the facts as to the occurrence of the two shootings, the time and location of the shootings, and the lack of any injuries stemming from the shootings. See *State* v. *Blango*, 103 Conn. App. 100, 111, 927 A.2d 964 (no abuse of discretion in admitting evidence of two separate incidents in which defendant displayed weapon when court limited testimony to that which was necessary to support victim's allegation that defendant displayed gun), cert. denied, 284 Conn. 919, 933 A.2d 721 (2007). With respect to the casings, the court's ruling permitted introduction of only the single casing found inside the Desert Eagle when it was recovered. The remaining five casings were introduced into evidence at the defendant's request, subject to his continued objection to the admission of all the casings.

Moreover, the introduction of the uncharged misconduct evidence did not consume an undue amount of time. See *State* v. *James G.*, 268 Conn. 382, 401, 844 A.2d 810 (2004) (prior misconduct evidence did not result in "trial within a trial" when it consisted of only twenty-five pages out of approximately 500 pages of trial transcript); *State* v. *Morlo M.*, 206 Conn. App. 660, 693, 261 A.3d 68 (prior misconduct evidence not distracting in amount of time it involved when state elicited

victim's testimony regarding two prior assaults without adducing any additional evidence elaborating on details of such assaults), cert. denied, 339 Conn. 910, 261 A.3d 745 (2021). In the present case, the misconduct evidence was introduced primarily through testimony interspersed throughout three days of the nine day trial and also included limited documentary evidence and a concise stipulation that was read to the jury. On the first day of evidence, Detective Grzegorzek testified briefly as to both the Maple Street and Prospect Street shootings.[19] On the second day of evidence, September 26, 2017, Officer Tvardzik testified as to the defendant's statement that he liked to play with guns and that five casings were recovered from Maple Street,[20] in a direct and cross-examination that amounted to only three pages of transcript. That same day, Detective Perez testified as to the spent casing found inside the Desert Eagle when it was recovered and the casings from the Maple Street shooting. On October 2, 2017, Van Deusen testified as to the shell casings from the Maple Street and Prospect Street shootings, and photographs of her comparisons were admitted into evidence. Finally, the stipulation regarding the defendant's guilty pleas was read to the jury on October 4, 2017. Although the challenged evidence was introduced through multiple witnesses, the prosecutor did not belabor his examination of the witnesses, and we cannot say that the presentation of the evidence consumed an undue amount of time.[21]

Finally, in an effort to minimize any prejudice that might arise from the admission of the challenged evidence, the trial court gave a limiting instruction in its final charge[22] to the jury regarding the purposes for which it could consider the evidence of other acts of uncharged misconduct of the defendant. It also gave contemporaneous limiting instructions accompanying the testimony of Van Deusen and Officer Tvardzik.[23] "Absent evidence to the contrary, we presume that the jury followed the court's limiting instruction." (Internal quotation marks omitted.) *State* v. *Lynch*, 123 Conn. App. 479, 493–94, 1 A.3d 1254 (2010); cf. *State* v. *Raynor*, supra, 337 Conn. 565 n.23 (recognizing that court gave limiting instructions on three separate occasions but noting that "limiting instructions may feature more prominently in a harmless error analysis").

Our Supreme Court has explained that "the care with which the [trial] court weighed the evidence and devised measures for reducing its prejudicial effect militates against a finding of abuse of discretion." (Internal quotation marks omitted.) *State* v. *Cutler*, 293 Conn. 303, 313, 977 A.2d 209 (2009), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014). In the present case, the court took care to weigh the evidence, which it previously had determined was highly probative. Specifically, it heard and considered lengthy arguments as to the challenged evidence and

excluded the evidence it determined to be unduly preju-
dicial, i.e., the five casings, or cumulative. See footnote
16 of this opinion. With respect to the evidence it did
admit, the court reduced its prejudicial effect by limiting
the state to a narrow presentation of the basic facts as
to the two shootings and by providing the jury with
limiting instructions as to the purposes for which it
could consider the evidence. Accordingly, we conclude
that the court did not abuse its discretion by admitting
the uncharged misconduct evidence.

The judgment is reversed and the case is remanded
for a new trial.

In this opinion the other judges concurred.

[1] At trial, New Britain Police Detective Thai Tran testified that there were
several possible reasons why no casing was found at the scene: the shooter
could have picked it up, a malfunction with the firearm could have kept
the casing within the firearm, a passing vehicle could have picked up the
casing in its tire treads, or a revolver could have been used.

[2] The state sought to introduce testimony that the police were administer-
ing a gunshot residue test, but the defendant objected. The court precluded
reference to a gunshot residue test, limiting the state to the general term
"test."

[3] Correction Officer Dale Brawn testified that Davis and the defendant
became cellmates at the MacDougall-Walker Correctional Institution in Suf-
field on October 28, 2014. Brawn further testified that El Massri was housed
in the same unit as the defendant at MacDougall-Walker from January 1
through March, 2015, and that El Massri worked as a barber while incarcer-
ated.

[4] Former Department of Correction Lieutenant Ruben Burgos testified
that, on November 19, 2014, he received, through a phone monitor, notifica-
tion that Davis had information and wanted to speak with a prosecutor or
the police, and Burgos interviewed Davis the following day, November 20,
2014. Burgos forwarded Davis' request, and a detective from the New Britain
Police Department interviewed Davis. Burgos testified that Davis was inter-
viewed six or seven times.

[5] Davis, a five time convicted felon, asked Detective Tran to speak to a
prosecutor in Hartford regarding criminal charges Davis had pending at the
time he gave his statement. Davis entered into a cooperation agreement
with the state, in which he agreed to provide information about this case
and a number of Hartford cases involving shootings that he had witnessed,
in exchange for the reduction of his pending criminal charge of home inva-
sion to a charge of attempt to commit assault in the first degree, and the
state's recommendation of a suspended sentence on that charge.

[6] Detective Tran testified that there was a Chinese food restaurant located
on South Main Street.

[7] El Massri had been convicted of eighteen felonies. Following El Massri's
statement to Detective Tran and in consideration for his testimony at the
defendant's trial, El Massri's existing agreement with the state with respect
to certain of his pending felonies was amended to permit him to argue for
a lesser sentence.

[8] On rebuttal, the state offered the testimony of Michael Sullivan, chief
inspector for the Office of the Chief State's Attorney. Sullivan testified
that the following factors are considered in determining the reliability of
informant information: whether the informant is in a position where he
could have obtained the information as he is claiming and whether there
is corroboration of the informant's information.

[9] Defense counsel also asked Detective Tran about an interview with
Joshua Ocasio, who, three years following the shooting of the victim, told
Detective Tran that he was present that night. Ocasio told Detective Tran
that he saw someone come up to the victim, a tussle occurred, and gunshots
were fired, but he was not able to identify the defendant.

[10] At trial, Johnson invoked his fifth amendment privilege against self-
incrimination.

[11] The prosecutor also stated: "[I]t was my understanding that Your Honor
was going to instruct the jury based on the proposed instructions and not
include the defendant's requested instruction. Correct?" The prosecutor

further explained: "It was my understanding that Your Honor was going to instruct the jury based on the proposed instructions that were given to counsel. I know that Your Honor did include an instruction on jailhouse informants and an instruction on completeness of the police investigation. I believe Your Honor's instructions are appropriate. I objected to the defendant's specific request." The court responded: "Well, at the time I gave you the instructions, to be quite honest, that was just the time, exactly the time that I received his request to charge, so I did want to consider those as well."

[12] Before charging the jury, the court made one additional change unrelated to the investigative inadequacy issue and provided copies of the updated charge to counsel.

[13] Practice Book § 42-16 provides in relevant part: "An appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of exception. . . ."

[14] The instruction that our Supreme Court in *State* v. *Gomes*, supra, 337 Conn. 856 n.20, "encourage[d]" trial courts to utilize "going forward," and which was subsequently approved by the Judicial Branch's Criminal Jury Instruction Committee as instruction 2.6-14, titled "Adequacy of Police Investigation," provides: "You have heard some testimony of witnesses and arguments by counsel that the state did not *<insert alleged investigative failure(s): e.g., conduct scientific tests, perform a thorough and impartial investigation, follow standard procedure, etc.>*. This is a factor that you may consider in deciding whether the state has met its burden of proof in this case because the defendant may rely on relevant deficiencies or lapses in the police investigation to raise reasonable doubt. Specifically, you may consider whether *<insert evidence of alleged police deficiencies or lapses>* would normally be taken under the circumstances, whether if (that/these) action(s) (was/were) taken, (it/they) could reasonably have been expected to lead to significant evidence of the defendant's guilt or evidence creating a reasonable doubt of his guilt, and whether there are reasonable explanations for the omission of (that/those) actions. If you find that any omissions in the investigation were significant and not reasonably explained, you may consider whether the omissions tend to affect the quality, reliability, or credibility of the evidence presented by the state to prove beyond a reasonable doubt that the defendant is guilty of the count(s) with which (he/she) is charged in the information. The ultimate issue for you to decide, however, is whether the state, in light of all the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the count(s) with which (he/she) is charged." See Connecticut Criminal Jury Instructions 2.6-14, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited January 5, 2022).

[15] In its memorandum of decision, the court stated that the defendant's statement that he liked to play with guns was not uncharged misconduct. It later determined, however, that it did constitute uncharged misconduct.

[16] The court's limiting instruction provided: "Ladies and gentlemen, the information, the testimony that was just offered by the state, is not being admitted to indicate any bad character, propensity or a criminal tendency by this defendant. The evidence is being admitted solely to show or establish the identity of the person who committed the crimes charged and an element of the crimes charged. You may not consider such evidence as establishing a propensity on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issue for which it is being offered but only as it bears upon that issue. On the other hand, if you don't believe the evidence or even if you find that it doesn't logically, rationally or conclusively support the issue for which it's being offered, then you may not consider it for any other purpose."

[17] The court excluded evidence of a DNA analysis performed on the Desert Eagle as cumulative. It ruled: "[T]he other forensic testing, at this point, is getting into Maple and Prospect Street rather than Roberts Street and the jury should be focusing on Roberts Street."

[18] On appeal, the defendant "does not contest the admission of evidence that Det[ective] Perez found the Desert Eagle under a car on School Street." He does challenge, however, the admission of the spent casing found inside the gun and the evidence relating to that casing.

[19] Also on the first day of evidence, Officer Tvardzik was called as a witness and briefly mentioned the Maple Street shooting before court was adjourned for the day.

[20] As noted previously, the court found that the relevance of the five casings from the Maple Street shooting was outweighed by its prejudicial impact. Defense counsel, however, requested that, because the court had allowed into evidence the casing from the Prospect Street shooting, that it also allow into evidence the other casings but continued to object to the admission of all the casings.

[21] Last, the defendant was not unfairly surprised by the evidence, as it was the subject of pretrial motions and a hearing.

[22] The court gave the following limiting instruction in its final charge: "The state has offered evidence of other acts of misconduct of the defendant. This is not admitted to prove the bad character, propensity or criminal tendencies of the defendant. Such evidence is being admitted solely to show or establish the defendant's intent, the identity of the person who committed the crimes alleged, a motive for the commission of the crimes alleged and an element of the crimes of murder and carrying a pistol without a permit.

"You may not consider such evidence as establishing a propensity on the part of the defendant to commit any crimes charged or to demonstrate criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally, and conclusively supports the issues for which it is being offered by the state but only as it may bear on the issues indicated above.

"On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it is being offered by the state; namely, the issues indicated above, then you may not consider that testimony for any purpose.

"You may not consider evidence about the misconduct of the defendant for any purpose other than the ones I have just told you, because it may predispose your mind unequivocally to believe that the defendant may be guilty of the offense here charged merely because of the alleged other misconduct. For that reason, you may consider this evidence only on the issues indicated above and for no other purpose."

The court further instructed the jury: "Additionally, there was testimony concerning the defendant's activities on Maple and Prospect Street on the dates following the crime at issue. Comments made to the investigating officers are not to be used as indicative of any bad character or propensity to commit any crime. They are to be used for the limited purpose indicated earlier."

[23] Although the court did not issue a contemporaneous limiting instruction with the testimony of Detective Grzegorzek or the reading of the stipulation as to the defendant's guilty pleas, we note that the defendant did not request a limiting instruction at that time.